UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

972 IRREVOCABLE TRUST and
INTERMED GAS PRODUCTS, LLC,

      Plaintiffs,

-against-

MICHAEL LAING, ROBERTA A. PUGLIESE,
LAING HOLDINGS CORPORATION and
INTERACTIVE MEDICAL TECHNOLOGIES, CORP.,

      Defendants.

Case No.:  08-civ-4907-RPP-HP
ECF CASE

---

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1441 and 1446, Defendants Michael Laing (hereinafter referred to as "Laing"), Roberta A. Pugliese (hereinafter referred to as "Pugliese"), Laing Holdings Corporation (hereinafter referred to as "LHC") and Interactive Medical Technologies Corp. (hereinafter referred to as "IMT") (collectively hereinafter referred to as "Defendants") jointly remove to this Court the state-court action described in paragraph 1 below.

## THE REMOVED ACTION

1.     The removed action is a civil action that was served on Defendants on April 28, 2008 New York State Supreme Court for the County of New York, and styled: *972 IRREVOCABLE TRUST and INTERMED GAS PRODUCTS, LLC., Plaintiffs, v MICHAEL LAING, ROBERTA A. PUGLIESE, LAING HOLDINGS CORPORATION and INTERACTIVE MEDICAL TECHNOLOGIES, CORP., Defendants., Index No. 105430/08.*

### PAPERS FROM THE REMOVED ACTION

2. As required by 28 U.S.C. § 1446(a), attached hereto as Exhibit "A" are true and accurate copies of all process, pleadings, and orders served upon Defendants in the removed action.

### ALL DEFENDANTS CONSENT TO THE REMOVAL

3. Defendants are jointly represented by undersigned counsel in the removed action. By and through their counsel, Defendants all consent to removal of the action to this Court.

### THE REMOVAL IS TIMELY

4. The Defendants were served with a copy of the Summons and Complaint (hereinafter, "Complaint") in the removed action was April 28, 2008. This notice of removal is filed within 30 days of that date and, therefore, is timely under 28 U.S.C. § 1446(b).

### THE VENUE REQUIREMENT IS MET

5. Venue of this removal is proper under 28 U.S.C. § 1441(a) because this Court is in the United States District Court for the district and division corresponding to the place where the state-court action was pending.

### DIVERSITY OF CITIZENSHIP EXISTS

6. This is a civil action that falls within the Court's original jurisdiction under 28 U.S.C. § 1332 (diversity of citizenship) and is one that may be removed to this Court based on diversity of citizenship under 28 U.S.C. §§ 1441 and 1446.

7. As admitted in the Complaint, Plaintiff 972 IRREVOCABLE TRUST (hereinafter referred to as "972 IT") was organized under the laws of Lichtenstein and its' place of business

2

is New York County, New York. (*See* Pls.' Compl. ¶ 1 and face of Summons)

8. Plaintiff Intermed Gas Products, L.L.C. ("Intermed") is a New York limited liability company with its' principal place of business located in New York County, New York.  (*See id.* ¶ 2., 7 and face of Summons)

9. Defendants are not, and were not at the time the action was commenced, citizens of New York. (*See id,* ¶ 3., 4. 5. & 6.) Defendants are, and at the time the action was commenced, citizens of the State of Florida. Individual Defendants Laing and Pugliese are residents of Palm Beach County, Florida and Defendants LHC and IMT are corporations formed under the laws of the State of Florida with their principal place of business being located in Palm Beach County, Florida.

<u>**THE AMOUNT-IN-CONTROVERSY REQUIREMENT IS SATISFIED**</u>

10. The monetary value of the amount in controversy exceeds $75,000, exclusive of interests and costs.

11. Plaintiffs seek damages for alleged injuries suffered as a result of Defendants' alleged breach of contract, breach of fiduciary duty, an accounting, conversion, embezzlement, wasting corporate opportunity, and intentional interference with business relationships (*See* Pls.' Compl.) With the exception of the count for an Accounting, Plaintff seeks damages into the millions of dollars. (See Pls.' s Compl.) Based on these allegations, the amount-in-controversy requirement is satisfied.

12. Thus, the state court action may be removed to this Court by Defendants in accordance with the provisions of 28 U.S.C. § 1441(a) because (i) this action is a civil action

3

pending within the jurisdiction of the United States District Court for the Southern District of New York; (ii) this action is between citizens of different states; and (iii) the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. If any question arises as to the propriety of the removal of this action, Defendants request the opportunity to brief any disputed issues and to present oral argument in support of their position that this case is properly removable.

14. Nothing in this Notice of Removal shall be interpreted as a waiver or relinquishment of any of Defendants' rights to assert any defenses including, without limitation, the defenses of 1) lack of jurisdiction over the person, 2) improper venue, 3) insufficiency of process, 4) insufficiency of service of process, 5) improper joinder of claims and/or parties, 6) failure to state a claim, 7) failure to join an indispensable party(ies), or 8) any other procedural or substantive defense available under state or federal law.

## SERVICE AND FILING OF THE REMOVAL PAPERS

15. Pursuant to 28 U.S.C. § 1446(d), written notice of the removal of this action has been given simultaneously to Plaintiffs' counsel, and a Notification of Filing Notice of Removal in Federal Court is simultaneously being filed with the New York State Supreme Court for the County of New York. A true and accurate copy of this Notice is attached hereto as Exhibit "B".

WHEREFORE, Defendants jointly request that further proceedings be conducted in this Court as provided by law.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true copy of the foregoing was faxed and mailed this

28th day of May, 2008 to all parties on the attached service list.

**JEFFREY M. GLOTZER, P.A.**

Attorney for Defendants Michael Laing,
Roberta A. Pugliese, Laing Holdings
Corporation and Interactive Medical
Technologies, Corp.
6111 Broken Sound Parkway, NW
Suite 330
Boca Raton, FL 33487
Phone: (561) 443-1994
Fax: (561) 431-3104

By: _____
JEFFREY M. GLOTZER
E-mail: jeff@jeffglotzerlaw.com
New York State Bar No. 2330447

5

**Service List**

Robert L. Rimberg
Goldberg & Rimberg
Counselors at Law PLLC
*Attorneys for Plaintiffs*
115 Broadway, 3rd Floor
New York, New York 10006

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X

972 IRREVOCABLE TRUST and
INTERMED GAS PRODUCTS LLC.,

                              Plaintiff,

              -against-


MICHAEL LAING, ROBERTA PUGLIESE,
LAING HOLDINGS CORPORATION and
INTERACTIVE MEDICAL TECHNOLOGIES, CORP.


                              Defendants.
------------------------------------------------------------X

**SUMMONS**


Index No.: 105430/08

Dated Filed: 4/16/08
Plaintiff designates New
York County as the place of
trial

The basis of the venue
is plaintiff's place of
business

4-28-08  5:25pm

**TO THE ABOVE NAMED DEFENDANTS:**


        **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve
a copy of your answer, or, if this complaint is not served with this summons, to serve a notice of
appearance, on the Plaintiff's attorney(s) within twenty (20) days after the service of this
summons, exclusive of the day of service (or within thirty (30) days after service is complete if
the summons is not personally delivered to you within the State of New York); and in the case of
your failure to appear or answer, judgment will be taken against you by default for the relief
demanded in the complaint.

Dated:  New York, New York
        April 15, 2008


                              Robert L. Rimberg
                              Goldberg & Rimberg
                              Counselors at Law PLLC
                              *Attorney for Plaintiffs*
                              115 Broadway, 3rd Floor
                              New York, New York 10006


**EXHIBIT  "A"**

**Defendants' Address:**
Michael Laing
305 Trieste Drive
Palm Beach Gardens, Florida 33418

Roberta Pugliese
305 Trieste Drive
Palm Beach Gardens, Florida 33418

Laing Holdings Corporation
305 Trieste Drive
Palm Beach Gardens, Florida 33418

Interactive Medical Technologies, Corp.
305 Trieste Drive
Palm Beach Gardens, Florida 33418

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
972 IRREVOCABLE TRUST and
INTERMED GAS PRODUCTS LLC.,

              Plaintiffs,

                   Index No.:

     -against-

MICHAEL LAING, ROBERTA PUGLIESE,
LAING HOLDINGS CORPORATION and        COMPLAINT
INTERACTIVE MEDICAL TECHNOLOGIES, CORP.

              Defendants.
-------------------------------------------------------------X

      Plaintiffs, 972 Irrevocable Trust and Intermed Gas Products, LLC, as and for their

complaint against the defendants, Michael Laing, Roberta Pugliese, Laing Holdings Corporation

and Interactive Medical Technologies, Corp (referred to as the "Defendants") allege as follows:

## PARTIES

1.        Plaintiff 972 Irrevocable Trust [hereinafter the "Trust"] is an irrevocable trust

organized under the laws of the Lichtenstein.

2.        Plaintiff Intermed Gas Products, LLC [hereinafter "Intermed" or the "Company"]

is a New York limited liability company.

3.        Upon information and belief, defendant Michael Laing is resident of the State of

Florida and regularly and systematically transacts business in the State of New York.

4.        Upon information and belief, defendant Roberta Pugliese is a resident of the State

of Florida.

5.        Upon information and belief, defendant Laing Holdings Corporation is a Florida

1

corporation.

6.          Upon information and belief, defendant Interactive Medical Technologies, Corp.

is a Florida corporation.


## BACKGROUND

7.          Intermed, a New York limited liability company, filed Articles of Organization

with the State of New York on November 30, 2005.

8.          Intermed executed an Operating Agreement on November 30, 2005 [hereinafter

the "2005 Operating Agreement" and annexed hereto as Exhibit A].

9.          The Members of Intermed Gas Products, LLC in the 2005 Operating Agreement

were Martell, LLC; Laing Holdings Corporation [hereinafter Laing Holdings]; and W. Murray

Corporation.

10.          The 2005 Operating Agreement listed the membership interest of the members.

11.          The 2005 Operating Agreement recorded that Martell, LLC [hereinafter

"Martell"] had a 1% membership interest in Intermed.

12.          The 2005 Operating Agreement recorded that Laing Holdings Corporation had a

49.5% membership interest in Intermed.

13.          The 2005 Operating Agreement recorded that W. Murray Corporation had a

49.5% membership interest in Intermed.

14.          On February 23, 2006, an Amended and Restated Operating Agreement

[hereinafter the "Operating Agreement" and annexed hereto as Exhibit B] for Intermed Gas

Products, LLC, was executed as between Martell, Laing Holdings, and W. Murray Corporation.

15.          On June 28, 2007, a Forbearance Agreement was executed by and between

Intermed, Laing Holdings, Michael Laing individually, and Martell.  A copy of the Forbearance Agreement is annexed hereto as Exhibit C.

16.    The Forbearance Agreement transferred Martell's entire membership interest in the Company to Plaintiff 972 Irrevocable Trust [hereinafter the "Trust"].

17.    As a result of the Forbearance Agreement, Martell withdrew as a Member of the Company.

18.    Under the terms of the Forbearance Agreement, the Trust has been substituted as a Member and assumes all of the rights and benefits of Martell under the Operating Agreement.

19.    At the time of the Forbearance Agreement, Intermed, Laing Holdings and Michael Laing were in default of their agreements with respect to existing agreements with Martell.

20.    The Forbearance Agreement was intended to induce Martell to forbear from taking immediate action against Intermed, Laing Holdings and Michael Laing on account of said defaults.

21.    As a result of the Forbearance Agreement, the membership interests in Intermed changed.

22.    As a result of the Forbearance agreement, the membership interest in the Company as of May 31, 2007 of Michael Laing individually is 32.5%.

23.    As a result of the Forbearance agreement, the membership interest in the Company as of May 31, 2007 of 972 Irrevocable Trust is 57.5%.

24.    As a result of the Forbearance agreement, the membership interest in the Company as of May 31, 2007 of "MERLIN" is 10%.

3

### Michael Laing

25.        Defendant Laing is, and at all relevant times was, the President of Laing Holdings.

26.        Laing was a consultant to the Company until April 9, 2008.

27.        Laing Holdings was a consultant to the Company until April 9, 2008.

28.        Laing and Laing Holdings were terminated due to conduct damaging Intermed, breach of fiduciary duty, breach of contract, diversion of corporate opportunity, conversion, embezzlement and negligence.

### Intermed Gas Products, LLC.

29.        The business of the Company is to arrange for the manufacture, purchase and sale of gas cylinders, valves, regulators, conserving devices and other related devices from suppliers and resell them to third parties

30.        Many of the products sold by the Company are made overseas and then sold domestically to companies in the healthcare area.

31.        Specifically, the Company sells, among other things, fingertip pulse oximeters which are used to indirectly measure a patient's blood's oxygen saturation.

### Agreements

32.        Laing and Laing Holdings consented individually to devote his "full time and attention to the business of the Company" in ¶4.4 of the 2005 Operating Agreement and the (amended) Operating Agreement.

33.        Laing and Laing Holdings consented in the 2005 Operating Agreement

individually not to "directly or indirectly, engage or invest in, own, manage, operate, finance, control, or participate in the ownership management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend [his] name or any similar name to, lend their credit to, or render service or advice to, any business whose products, product development, sales, services or other activities of or offered by Company..."

34.        Defendant Laing Holdings consented on behalf of Michael Laing individually and on its own accord as a corporation in ¶4.5 of the (amended) Operating Agreement not to engage "in any transaction competitive with the business of the Company."

### Competing Ventures

35.        Upon information and belief, Defendant Pugliese is the girlfriend of Defendant Laing and operates Interactive Medical Technologies, Corp [hereinafter "Interactive"], a Florida Corporation.

36.        Upon information and belief, Interactive is a competitor to the Company, buying and reselling similar merchandise as the Company.

37.        Upon information and belief, the primary business of Interactive is, among other things, to buy and resell fingertip pulse oximeters.

38.        Upon information and belief, Laing has assisted Pugliese in the operation and management of Interactive during the time that he was employed by the Company

39.        Upon information and belief, Laing continues to assist Pugliese in the operation and management of Interactive during the time that he was employed by the Company.

40.        Upon information and belief, the assistance provided by Laing has included

5

50.        There have been other transfers of funds from bank accounts belonging to the

6

Company.

51.    Upon information and belief, Laing and Laing Holdings transferred funds prior to April 9, 2008 into accounts under his control for his own personal use that do not belong to the Company.

52.    Upon information and belief, inventory was wrongfully taken by Laing.

53.    Such inventory is represented by a physical adjustment recorded by the Company in November 2006 in the amount of $260,000.


### Mismanagement of the Company

54.    Laing and Laing Holdings have failed to file tax returns for the Company for the years 2006 and 2007.

55.    Laing and Laing Holdings failed to issue IRS Form 1099's on behalf of the company during the years 2006-2007.

56.    Laing and Laing Holdings allowed receivables to be paid late causing the company not to generate enough cash for day to day operations.

57.    Throughout his employment with the Company, Laing kept inaccurate records of inventory and the Company's finances.

58.    Throughout his employment with the Company, Laing's monthly and annual sales projections were often grossly misstated.

59.    Said sales projections were required to plan for the future, finance the company and run day to day operations.

60.    Throughout his association with the Company, Laing often misstated the his own

7

. providing names and contact information of the Company's clients and names and contact

numbers of the Company's suppliers.

41.        Upon information and belief, Laing has found products for Pugliese to purchase

and sell.

42.        Upon information and belief, such cooperation has usurped corporate

opportunities that would otherwise have been available to the Company.

43.        Upon information and belief, Laing was compensated for his efforts and

assistance to Interactive.

44.        Laing has admitted instances where the Company had a business opportunity but

he decided to give the opportunity to Interactive.


### Missing Funds and Inventory

45.        The Company maintains at least one bank account at Bank of America.

46.        The only individual of the Company on April 9, 2008 that was a signatory on the

Company's bank account was Laing.

47.        On or about April 9, 2008, Laing and Laing Holdings' association with the

Company was terminated, $9,000.00 was transferred from the Company's bank account at Bank

of America.

48.        Upon information and belief, the funds were transferred by Laing.

. 49.        Upon information and belief, the funds were transferred into an account

controlled by Laing that does not belong to the Company.

50.        There have been other transfers of funds from bank accounts belonging to the

sales projections by as much as fifty percent (50%).

61.      Laing often purchased the wrong items for inventory.

62.      Laing often purchased too much inventory.

63.      On other occasions Laing purchased far too little inventory.

64.      Laing often purchased inventory too late.

65.      Upon information and belief, following Laing and Laing Holdings's termination, Laing contacted suppliers of the Company in China.

66.      Upon information and belief, such communication was made after Laing and Laing Holdings termination on April 9, 2008.

67.      As a result of the above mentioned communications, various Chinese suppliers have refused to respond to telephone calls or emails from employees of the company.

68.      As a result of the above mentioned communications, Chinese suppliers have thereafter not made deliveries to the Company causing interference with day to day activities.

69.      Laing has taken property belonging to the company for use by parties other than of the company. Such property includes customer files and documents belonging to the Company as well as money transfers from corporate bank accounts into his own bank account. Since being terminated from the Company, Laing has returned and while claiming that he was looking for personal documents, was observed removing files belonging to the Company.

70.      Upon information and belief, Laing has utilized the Company's resources and proprietary secrets to conduct business for Interactive.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST

8

## DEFENDANT MICHAEL LAING

### (Breach of Contract)

71.         Plaintiff repeats and realleges paragraphs 1-69 above, inclusive, as if fully set forth herein.

72.         Defendant Laing was personally obligated under paragraph 4.4 of the Operating Agreement to devote his full time and attention to the business of the Company.

73.         Defendant Laing did not devote his full time and attention to the business of the Company, and instead assisted Defendant Pugliese in the operation and management of Interactive.

74.         Laing is violating paragraph 4.4 by means of his past and continued role in the operation and management of Interactive.

75.         As a result of the foregoing, Plaintiff has been injured by Laings failure to abide by the terms of the Operating Agreement and have been deprived of the benefit of the Operating Agreement.

76.         As a result of Laing's breach of contract, Plaintiffs have been damaged in an amount to be determined at trial but in no event less than$2,000,000.00 together with interest thereon.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST

## DEFENDANT LAING HOLDINGS CORPORATION

### (Breach of Contract)

77.         Plaintiff repeats and realleges paragraphs 1-76 above, inclusive, as if fully set

9

forth herein.

78.        Defendants Laing and Laing Holdings were personally prohibited under

paragraph 4.5 of the Operating Agreement from engaging in any transaction competitive with the

business of the Company, directly or indirectly, and more specifically not to "engage or invest in,

own, manage, operate, finance, control, or participate in the ownership, management, operation,

financing, or control of, be employed by, associated with... any business whose product,

products development, sales, services or other activities compete in any respect with the.

products, product development, sales, services or other activities of or offered by the Company"

anywhere in the world while Laing Holdings Corporation is a Member of the Company of for a

five (5) year period thereafter.

79.        Laing and Laing Holdings were associated with Interactive and assisted his

girlfriend and co-defendant in the management and operation of said business.

80.        Interactive was, and continues to be, a competing business to the Company.

81.        Laing and Laing Holdings are violating paragraph 4.5 by way of his past and

continued support and association with Interactive.

82.        As a result of the foregoing, Plaintiff has been injured by Laings failure to abide

by the terms of the Operating Agreement and have been deprived of the benefit of the Operating

Agreement.

83.        As a result of Laing's and Laing Holdings breach of contract, Plaintiffs have been

damaged in an amount to be determined at trial but in no event less than$2,000,000.00 together

with interest thereon.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST

## DEFENDANT MICHAEL LAING AND LAING HOLDINGS

### (Breach of Fiduciary Duty)

84.          Plaintiff repeats and realleges paragraphs 1-83 above, inclusive, as if fully set forth herein.

85.          During his employment Defendant Michael Laing and Laing Holdings had a fiduciary duty to the Company.

86.          Laing and Laing Holdings did not exert their best efforts on behalf of the Company.

87.          Laing and Laing Holdings assisted another corporation in competing with the Company and profited at its expense.

88.          Laing and Laing Holdings placed their private interests in conflict with the interests of the Company by transferring funds into his own bank accounts and wrongfully taking inventory from the Company for the benefit of Interactive, a company from which he was compensated.

89.          Laing and Laing Holdings took the Company's customer files for competitive use and utilized the Company's time, facilities and proprietary secrets to further such use.

90.          Laing and Laing Holdings have usurped corporate opportunities on behalf of co-defendants Pugliese and Interactive.

91.          As a result of the foregoing, Plaintiff has been injured by Laing and Laing Holdings' breach of fiduciary duty to the Company.

92.          As a result of Laing and Laing Holdingss breach of fiduciary duty, Plaintiffs have

11

been damaged in an amount to be determined at trial but in no event less than$2,500,000.00 together with interest thereon.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST

## DEFENDANT MICHAEL LAING AND LAING HOLDINGS

### (For an Accounting)

93.        Plaintiff repeats and realleges paragraphs 1-92 above, inclusive, as if fully set forth herein.

94.        Defendants Laing and Laing Holdings have retained and/or caused to be diverted to himself sums of money properly belonging to the Company, the amount of which is unknown at this time to the plaintiff.

95.        Plaintiff seeks an accounting in order for it to identify, quantify and recover any and all money that has been wrongfully retained or diverted by Laing and belonging to the Company.

96.        Defendant has failed to account for any missing monies that he has been asked about by Plaintiff and/or its agents.

97.        Plaintiff has no adequate remedy at law.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST

## DEFENDANT MICHAEL LAING

### (Conversion)

98.        Plaintiff repeats and realleges paragraphs 1-97 above, inclusive, as if fully set

12

forth herein.

99.         Laing and Laing Holdings have exercised dominion and/or control over customer

files and documents belonging to the Company which interferes with the Company's rights.

100.        Laing and Laing Holdings have exercised dominion and/or control over the

Company's inventory which interferes with the Company's rights.

101.        As a result of the foregoing, Plaintiffs have been damaged in an amount to be

determined at trial but in no event less than$3,000,000.00 together with interest thereon.

## AS AND FOR A SIXTH CAUSE OF ACTION AGAINST

## DEFENDANT MICHAEL LAING AND LAING HOLDINGS

### (Embezzlement)

102.        Plaintiff repeats and realleges paragraphs 1-101 above, inclusive, as if fully set

forth herein.

103.        Laing and Laing Holdings were entrusted by the Company to hold monies on

behalf of the Company.

104.        Laing and Laing Holdings converted the monies he was entrusted to hold and

deposited monies into his own bank accounts.

105.        As a result of the foregoing, Plaintiff has Plaintiffs have been damaged in an

amount to be determined at trial but in no event less than$300,000.00  together with interest

thereon.

13

## AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST

## DEFENDANT MICHAEL LAING

### (Wasting Corporate Opportunity)

106.        Plaintiff repeats and realleges paragraphs 1-105 above, inclusive, as if fully set

forth herein.

107.        Laing and Laing Holdings had the custody of names and contact information of

the Company's clients and/or potential clients.

108.        Laing and Laing Holdings provided such information to Pugliese and/or

Interactive causing a loss of potential clients to the Company.

109.        As a result of the foregoing, Plaintiffs have been damaged in an amount to be

determined at trial but in no event less than$2,000,000.00  together with interest thereon.

## AS AND FOR AN EIGHTH CAUSE OF ACTION AGAINST DEFENDANTS ROBERTA

## PUGLIESE AND INTERACTIVE MEDICAL TECHNOLOGIES, CORP.

### (Intentional Interference with Business Relationships)

110.        Plaintiff repeats and realleges paragraphs 1-109 above, inclusive, as if fully set

forth herein.

111.        Defendant Pugliese is the principal of Interactive as well as the girlfriend of

Defendant Laing.

112.        Interactive is a competitor to the Company.

14

113.    Defendant Laing is personally obligated under the Operating Agreement not to compete or be associated with any other company that competes with the Company.

114.    Defendant Laing is personally obligated under the Operating Agreement to devote his full time and attention to the Company.

115.    Defendant Pugliese has intentionally and through wrongful acts prevented Defendant Laing from complying with the Operating Agreement by seeking his assistance in operating and managing Interactive.

116.    As a result of the foregoing, Plaintiff has been damaged by Pugliese's intentional and wrongful acts preventing Defendant Laing from complying with the operating agreement.

117.    As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial but in no event less than $3,000,000.00 together with interest thereon.

## AS AND FOR A NINTH CAUSE OF ACTION AGAINST

## DEFENDANT MICHAEL LAING

### (Conversion)

118.    Plaintiff repeats and realleges paragraphs 1-117 above, inclusive, as if fully set forth herein.

119.    Laing and Laing Holdings have exercised dominion and/or control over monies belonging to the Company which interferes with the Company's rights.

120.    On or about April 9, 2008, Laing and Laing Holdings transferred $9,000 from an account belonging to the Company and into his own personal account.

121.    As a result of the foregoing, Plaintiff has been damaged by Laing and Laing Holdings' acts of conversion of the Company's assets in an amount to be determined at trial but

15

in no event less than $9,000.00  together with interest thereon.

## AS AND FOR A TENTH CAUSE OF ACTION AGAINST

## DEFENDANT MICHAEL LAING AND LAING HOLDINGS

### (Negligence)

122.      Plaintiff repeats and realleges paragraphs 1-120 above, inclusive, as if fully set forth herein.

123.      Lang and Laing Holdings served as President of the Company.

124.      Laing and Laing Holdings allowed receivables to be paid late.

125.      Throughout his employment with the Company, Laing and Laing Holdings kept inaccurate records of inventory and the Company's finances.

126.      Throughout his employment with the Company, Laing's monthly and annual sales projections were often overly misstated.

127.      Throughout his association with the Company, Laing often misstated his own sales projections by as much as fifty percent (50%).

128.      Laing and Laing Holdings often purchased the wrong items for inventory.

129.      Laing and Laing Holdings often purchased too much inventory.

130.      Laing and Laing Holdings often purchased too little inventory.

131.      Laing and Laing Holdings often purchased inventory too late.

132.      Laing and Laing Holdings personally is the cause of the damage to the Company.

133.      As a result of Laing and Laing Holdings' actions, the Company has been damaged in an amount to be determined at trial but in no event less than $5,000,000.00.

### PRAYER FOR RELIEF

16

WHEREFORE, Plaintiff prays for the entry of a judgment from this Court:

On the First Cause of Action, judgment against Defendant Michael Laing, in an amount to be determined at trial but in no event less than $2,000,000.00 together with interest thereon;

On the Second Cause of Action, judgment against Defendant Laing Holdings Corporation, in an amount to be determined at trial but in no event less than $2,000,000.00 together with interest thereon;

On the Third Cause of Action, judgment against Defendant Michael Laing, in an amount to be determined at trial but in no event less than $2,500,000.00 together with interest thereon;

On the Fourth Cause of Action, judgment against the defendant Michael Laing and an accounting of the receipts of the Company from November 30, 2005 to April 9, 2008, together with an award of damages or restitution of such monies as may be determined by said accounting to have been wrongfully withheld from the Company, together with interest, the costs and professional or other fees incurred in connection with said accounting, together with prejudgment interest thereon;

On the Fifth Cause of Action, judgment against Defendant Michael Laing, in an amount to be determined at trial but in no event less than $3,000,000.00, together with prejudgment interest thereon;

On the Sixth Cause of Action, judgment against Defendant Michael Laing, in an amount to be determined at trial but in no event less than 300,000.00, together with prejudgment interest thereon;

17

On the Seventh Cause of Action, judgment against Defendant Michael Laing in an amount to be determined at trial but in no event less than $2,000,000.00, together with interest thereon.

On the Eighth Cause of Action, judgment against the Defendants Roberta Pugliese and Interactive Medical Technologies, Corp., in an amount to be determined at trial but in no even less than $3,000,000.00, together with prejudgment interest thereon;

On the Ninth Cause of Action, judgment against Defendant Michael Laing in an amount to be determined at trial but in no event less than $9,000.00, together with interest thereon.

On the Tenth Cause of Action, judgment against Defendant Michael Laing in an amount to be determined at trial but in no event less than $5,000,000.00, together with interest thereon.

On all Causes of Action, costs and fees, including reasonable attorneys' fees, incurred by plaintiff in connection with this action and such other relief as the Court deems just and proper.

Dated: New York, New York
        April 15, 2008

Robert L. Rimberg
GOLDBERG & RIMBERG
COUNSELORS AT LAW, PLLC
115 Broadway, 3rd Floor
New York, New York 10006
(212) 697-3250
Attorneys for Plaintiff 972 Irrevocable Trust
and Intermed Gas Products, LLC

18

OPERATING AGREEMENT
FOR
INTERMED GAS PRODUCTS, LLC
A NEW YORK LIMITED LIABILITY COMPANY

This Operating Agreement (this "Agreement"), is made as of November 30, 2005, by and between the parties listed on the signature pages hereof (collectively referred to as the "Members" or individually as a "Member"), with reference to the following facts:

A.      On November 30, 2005 Articles of Organization ("Articles") for INTERMED GAS PRODUCTS, LLC (the "Company"), a New York limited liability company, was filed with the New York Secretary of State.

B.      The Members desire to adopt and approve an operating agreement for the Company under the New York Limited Liability Company Law (the "Act").

NOW, THEREFORE, the Members by this Agreement set forth the operating agreement for the Company upon the terms and subject to the conditions of this Agreement.

ARTICLE I
ORGANIZATIONAL MATTERS

1.1     Name.  The name of the Company shall be "Intermed Gas Products, LLC." The Company may conduct business under those names or any other name approved by the Members.

1.2     Term.  The term of the Company commenced as of the date of the filing of the Articles and shall continue until terminated as hereinafter provided.

1.3     Office and Agent.  The Company shall continuously maintain an office and registered agent in the State of New York as required by the Act. The registered office of the Company in the State of New York is located at c/o Martell, LLC, 405 Park Avenue, 15th Floor, New York, NY 10022. The registered agent for the Company for service of process at such address is Michael Milea. The principal office of the Company shall be at 405 Park Avenue, 15th Floor, New York, New York 10022, or such other location as the Members may determine.

1.4     Business of the Company.  Notwithstanding the purpose of the Company which is described in the Articles, the Company shall not engage in any business other than the following without the consent of all of the Members:

A.      the purchase from suppliers and resale of gas cylinders, valves, regulators, conserving devices and other related devices; and

B.      such other activities directly related to the foregoing business as may be necessary or advisable in the reasonable opinion of the Members to further such business.

## ARTICLE II
## CAPITAL CONTRIBUTIONS

2.1    Capital Contributions.    Each Member shall make an initial contribution to the capital of the Company, in kind and in the amount shown opposite the Member's name on Exhibit A attached hereto. Except as provided in this Agreement, no Member may withdraw his or her capital contribution.

2.2    Capital Accounts.    The Company shall establish an individual capital account ("Capital Account") for each Member. The Company shall determine and maintain each Capital Account in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). Upon a valid transfer of a Member's interest in the Company ("Membership Interest") in accordance with Article VI, such Member's Capital Account shall carry over to the new owner.

2.3    No Interest.    The Company shall not pay any interest on capital contributions.

## ARTICLE III
## MEMBERS

3.1    Admission of Additional Members.    Additional Members may be admitted with the approval of all Members. Additional Members will participate in the management, "Net Profits", "Net Losses" (as such terms are defined in Section 5.1), and distributions of the Company on such terms as are determined by the Members. Exhibit A shall be amended upon the admission of an additional Member to set forth such Member's name and capital contribution.

3.2    Withdrawals or Resignations.    No Member may withdraw, retire or resign from the Company, other than in connection with a transaction permitted by Section 7 hereof.

3.3    Payments to Members.    Except as specified in this Agreement or pursuant to a transaction permitted by Section 4.6, no Member or person or entity controlled by, controlling or under common control with the Member (each such person or entity is defined as an "Affiliate"), is entitled to remuneration for services rendered or goods provided to the Company. However, the Company shall reimburse the Members and their Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company, prepare the Articles and this Agreement and, as approved by the Members, for the actual cost of goods and materials used by the Company.

## ARTICLE IV
## MANAGEMENT AND CONTROL OF THE COMPANY

4.1    Management and Powers.    Except as otherwise expressly provided herein, each Member shall participate in the control, management and direction of the business of the Company, and, except as otherwise expressly provided herein, all decisions or consents of Members shall be taken by majority vote, with each Member entitled to votes in accordance with its Membership Interest. By majority consent, the Members may appoint, employ, fire, or otherwise contract with any persons or entities for the transaction of business of the Company or the performance of services for or on behalf of the Company, and the Members may delegate to any such person or entity such authority to act on behalf of the Company as the Members may from time to time deem appropriate. Notwithstanding the generality of the foregoing, a majority must include the vote of Martell's Membership Interest. In the event that a vote of a majority of Membership Interests does not include the affirmative vote of Martell, it shall be deemed not to have been affirmatively voted on.

4.2    Special Bankruptcy Rule.    The Company may not file for protection from its creditors under the United States Bankruptcy Code or any other federal or state statute affecting the rights of creditors generally, without the written approval of a majority in interest of the Membership Interests, and if Martell, LLC ("Martell"), for whatever reason, does not hold a majority in interest of the Membership Interests then, such filing may not be made without the express written approval of Martell.

2

4.3    Member Approval. No annual or regular meetings of the Members are required to be held. However, if such meetings are held, such meetings shall be noticed, held and conducted pursuant to the Act. In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Act. Unless otherwise expressly provided in this Agreement, approval of the Members shall mean the majority approval of the Membership Interests

4.4    Devotion of Time. Laing Holdings Corporation ("MLCO") and its principal Michael Laing ("Laing") and W. Murray Corporation ("WMCO") and its principal William Murray ("Murray") shall devote their full time and attention to the business of the Company and Martell shall devote whatever time or effort it deems appropriate for the furtherance of the Company's business.

4.5    Competing Activities. The Members and their Affiliates may engage or invest in any activity. The MLCO, Laing, WMCO and Murray may not engage in any transaction, competitive with the business of the Company, specifically they shall not while the are Members and for a five (5) year period therafter, directly or indirectly, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend their name or any similar name to, lend their credit to, or render services or advice to, any business whose products, product development, sales, services or other activities compete in any respect with the products, product development, sales, services or other activities of or offered by Company, as such existed at or could be reasonably anticipated at, or before the date hereof specifically as it relates to the sale, resale or exploitation of the Concept (the "Restricted Business"), in any county of any state of the United States of America, and any other states or international jurisdictions throughout the world at any time, provided, however, that they may purchase or otherwise acquire up to (but not more than) one percent (1%) of any class of securities of any enterprise (but without otherwise participating in the activities of such enterprise) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934, as amended. The Members agree that this covenant is reasonable with respect to its duration, geographical area, and scope. In the event that any court determines that the duration or the geographic areas provided for in this Section, or both of them, are illegal or unenforceable, the parties intend that such court shall limit such duration or geographic scope to the minimum extent necessary so that such covenant shall remain in full force and effect for the greatest duration of time and in the greatest geographical area that would not render it unenforceable. The Members further intend that this covenant shall be deemed to be a series of separate covenants, one for each and every state or other political subdivision of the United States and for any other country in the world where this covenant is intended to be effective. The Members each further agrees that while they are Members and for a period of five (5) years thereafter, they will not (i) directly or indirectly, personally or through others, encourage, induce, attempt to induce, solicit or attempt to solicit (on the Member's own behalf or on behalf of any other person or entity) any employee of, or representative, agent, consultant, or advisor to, Company or Company to leave his or her employment with the Company; (ii) divert, or attempt to divert, any person or entity which is furnished services by the Company or furnishes services for or to the Company (including any person or entity known by the Member to be a prospective customer, supplier or material service provider of the Company) or (iii) induce or attempt to induce any customer, supplier or material service provider of the Company to cease being (or to not become) a customer, supplier or material service provider of the Company (including any person or entity known by Member to be a prospective customer, supplier or material service provider of the Company. The Members each acknowledge that the breach of this Section will cause the Company irrevocable harm and therefore, the Company in enforcing this Section, in addition to all other remedies available to it, shall be entitled to obtain injunctive relief without the necessity off obtaining a bond.

4.6    Member's Responsibilities. Notwithstanding the generality of this Article IV, Martell shall have the responsibility of originating, negotiating the terms and conditions of and managing each of the financing transactions entered into by the Company. Martell shall, in its sole discretion, provide adequate financing to fund the purchase of inventory by the Company. Martell shall also give business advice to the Company, including but not limited to, inventory planning, negotiating terms with suppliers, including purchase order schedules and terms, pricing, quality control, shipping schedules, , payment terms, Letter of Credit terms, etc., payment terms with key customers, review new hirings, meet with salesmen, attend staff meetings, review contracts, review receivables, source and engage consultants to



3

implement software upgrades, engage accountants, bookkeepers etc. who will report to Martell. Martell shall also provide financial and consulting services to the Company. Martell shall advise the Company and shall have sole approval of all financial matters including, but not limited to, Company accounting and financial systems and controls. All of the foregoing shall be governed by a separate Finance and Service Agreement between Martell, or an affiliate, and the Company. Martell shall have sole approval of all material business matters of the Company. The failure by Martell to engage in any of the specified services shall not constitute a default be Martell under this Agreement or give rise to any defense to the Obligations of the Company pursuant to the Finance and Service Agreement. MLCO and WMCO shall have the responsibility of arranging for the purchase and sale of inventory.

4.7    Transactions between the Company and the Members. Notwithstanding that it may constitute a conflict of interest, the Members and their Affiliates may engage in any transaction with the Company so long as such transaction is not expressly prohibited by this Agreement and if the transaction is approved in writing by unanimous consent of the Membership Interests.

## ARTICLE V
## ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

5.1    Definitions. When used in this Agreement, the following terms shall have the meanings set forth below:

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Treasury Regulations.

"Company Minimum Gain" shall have the meaning ascribed to the term "Partnership Minimum Gain" in the Treasury Regulations Section 1.704-2(d).

"Member Nonrecourse Debt" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Treasury Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Deductions" shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

"Membership Interest" shall mean the Membership Interest of a Member set forth on Exhibit "A" hereto.

"Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting at the close of each fiscal year employed on the Company's information tax return filed for federal income tax purposes.

"Nonrecourse Liability" shall have the meaning set forth in Treasury Regulations Section 1.752-1(a)(2).

"Treasury Regulations" shall mean the final or temporary regulations that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

5.2    Allocations of Net Profit and Net Loss.

A.    Net Loss. Net Loss shall be allocated to the Members in proportion to their Membership Interest. Notwithstanding the previous sentence, loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such Member's share of Company Minimum Gain that would be realized on a foreclosure of the Company's property. Any loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the

extent the other Members are not limited in respect of the allocation of losses under this Section 5.2A). Any loss reallocated under this Section 5.2A shall be taken into account in computing subsequent allocations of income and losses pursuant to this Article V, so that the net amount of any item so allocated and the income and losses allocated to each Member pursuant to this Article V, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to this Article V if no reallocation of losses had occurred under this Section 5.2A.

        B.     Net Profit. Net Profit shall be allocated to the Members in proportion to their Membership Interests.

    5.3     Special Allocations. Notwithstanding Section 5.2,

        A.     Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 5.3A shall be made in proportion to the amounts required to be allocated to each Member under this Section 5.3A. The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f). This Section 5.3A is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

        B.     Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. If there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any fiscal year, each member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 5.3B shall be made in proportion to the amounts required to be allocated to each Member under this Section 5.3B. The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(4). This Section 5.3B is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

        C.     Nonrecourse Deductions. Any nonrecourse deductions (as defined in Treasury Regulations Section 1.704-2(b)(1)) for any fiscal year or other period shall be specially allocated to the Members in proportion to their Membership Interests.

        D.     Member Nonrecourse Deductions. Those items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Treasury Regulations Section 1.704-2(i).

        E.     Qualified Income Offset. If a Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 5.3E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article V so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Section 5.3E to the extent possible, shall be equal to the net amount that would have been



allocated to each such Member pursuant to the provisions of this Article V if such unexpected adjustments, allocations, or distributions had not occurred.

5.4    Code Section 704(c) Allocations. Notwithstanding any other provision in this Article V, in accordance with Code Section 704(c) and the Treasury Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Section 5.4 are solely for purposes of federal, state and local taxes. As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

5.5    Distribution of Assets by the Company. Subject to applicable law and any limitations contained elsewhere in this Agreement, Members, acting by unanimous consent, may elect from time to time to cause the Company to make distributions. Distributions shall be first to the Members in proportion to their unreturned capital contributions until each Member has recovered his or her capital contributions, and then to the Members in proportion to their Membership Interests.

# ARTICLE VI
# TRANSFER AND ASSIGNMENT OF INTERESTS

6.1    Transfer and Assignment of Interests. No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Membership Interest (collectively, "transfer") except with the prior approval of a majority in interest of all Membership Interests, which approval may be given or withheld in the sole discretion of the Members. Notwithstanding the generality of the foregoing, Martell may transfer its ownership to another entity, with substantially similar ownership, provided that such transfer shall not have a Material Adverse Effect on the business as such term is defined in the Finance and Service Agreement between the parties dated November 30, 2005. Additionally, notwithstanding the generality of the foregoing, a majority must include the vote of Martell's Membership Interest. In the event that a vote of a majority of Membership Interests does not include the affirmative vote of Martell, it shall be deemed not to have been affirmatively voted on.

6.2    Substitution of Members. A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) consent of the Members is given in accordance with Section 6.1, (ii) such person executes an instrument satisfactory to the Members accepting and adopting the terms and provisions of this Agreement, and (iii) such person pays any reasonable expenses in connection with his or her admission as a new Member. The admission of a substitute Member shall not release the Member who assigned the Membership Interest from any liability that such Member may have to the Company. Notwithstanding the generality of the foregoing, Martell may transfer its interest, without the consent of any other Member, to its source of funding.

6.3    Transfers in Violation of this Agreement and Transfers of Partial Membership Interests. Upon a transfer in violation of Article VI or Article VII, the transferee shall have no right to vote or participate in the management of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the remaining Members, a transfer in violation of this Article VI would cause the termination of the Company under the Code, in the sole discretion of the remaining Members, the transfer shall be null and void.

## ARTICLE VII
## SPECIAL PROVISIONS

7.1 <u>Distributions.</u>    Notwithstanding any other provisions in this Agreement, the Company shall make distributions of cash flow as follows:

A. <u>While Note from Laing and Murray is Outstanding.</u>    While there is an outstanding note from Laing and Murray (collectively the "Stockholders"), to Intermed Gas Products, Incorporated ("IGI") then, on a monthly basis, the Company shall distribute, at Martell's sole discretion, one hundred percent (100%) of its cash flow (after debt service including repayment of outstanding obligations to Martell) to its Members in accordance with their Membership Interests. MLCO and WMCO each agrees to in turn distribute one hundred percent (100%) of said distributed cash flow to the Stockholders, who in turn agree to use 100% of said distributed cash flow to repay their note to IGI and cause IGI to use one hundred percent (100%) of such distributed cash flow to pay outstanding third party payables of IGI, until such obligations are paid in full.

B. <u>After Note from Laing and Murray is Paid.</u>    After the note from the MB Stockholders to IGI is paid in full, then the Company, on a bimonthly basis, shall distribute an amount sufficiently adequate so that the member may pay their federal, state and local income taxes on K-1 income from the Company.

7.2 <u>Martell's Option to Purchase.</u>

A. <u>First Option.</u>    Martell shall have an option to purchase fifty percent (50%) of each of MLCO's and WMCO's Membership Interest in the Company on February 28, 2007, each at a purchase price equal to three and one half (3½) times the cashflow of the Company for the Fiscal Year ended November 30, 2005, divided by four. Payment shall be made fifty percent (50%) 100% in cash at the time of closing, and fifty percent (50%) evidenced by a promissory note bearing interest at the rate of six percent (6%) due on February 28, 2011.

B. <u>Second Option.</u>    Martell shall have an option to purchase fifty percent (50%) of each of MLCO's and WMCO's Membership Interest in the Company on February 28, 2008, each at a purchase price equal to three and one half (3½) times the cashflow of the Company for the Fiscal Year ended November 30, 2007, divided by four. Payment shall be made 100% in cash at closing. Payment shall be made fifty percent (50%) in cash at the time of closing and fifty percent (50%) evidenced by a promissory note bearing interest at the rate of six percent (6%) due on February 28, 2012.

7.3 <u>Security Agreement.</u>    MLCO and WMCO shall enter into a security or pledge agreement with Martell pledging their Membership Interests in the Company to Martell as additional security for the Advances made by Martell pursuant to the Finance and Service Agreement.

7.4 <u>Additional Financing.</u>    It is anticipated that the Company will imminently need additional financing beyond what is contemplated by the Finance and Service Agreement. To the extent tha Martell is able to procure such additional financing and it requires an equity component, then and in that event, any dilution of equity will come solely from [WMCO] and [MLCO] and not from Martell.

7

## ARTICLE VIII
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

8.1    <u>Books and Records</u>. The books and records of the Company shall be kept in accordance with the accounting methods followed for federal income tax purposes. The Company shall maintain at the principal office of the Company all of the following:

A.    A current list of the full name and last known business or residence address of each Member set forth in alphabetical order, together with the capital contributions, capital account and Membership interest of each Member;

B.    A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

C.    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

D.    A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

E.    Copies of the financial statements of the Company, if any, for up to the six (6) most recent fiscal years; and

F.    The Company's books and records as they relate to the internal affairs of the Company, if any, for up to at least the current and past four (4) fiscal years.

8.2    <u>Reports</u>.  The Company shall cause to be filed, in accordance with the Act, all reports and documents required to be filed with any governmental agency.  The Company shall cause to be prepared at least annually information concerning the Company's operations necessary for the completion of the Members' federal and state income tax returns. The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each taxable year (i) such information as is necessary to complete the Members' federal and state income tax or information returns and (ii) a copy of the Company's federal, state, and local income tax or information returns for the year.

8.3    <u>Bank Accounts</u>. The Members shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other person

8.4    <u>Tax Matters for the Company</u>.  Martell is designated as "Tax Matters Partner" (as defined in Code Section 6231), to represent the Company (at the Company's expense) in connection with all examination of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith.

8.5    <u>Reports to Members</u>. The Company shall give financial reports to each member, monthly 30 days after the end of each month and annually, 75 days after the end of each year. Martell shall designate the preparer of such financial statements.

8.6    <u>Accountant</u>. The certified public accountants for the Company shall be Rachlin Cohen and Holtz LLP or such other certified public accountants as chosen by Martell.

8

## ARTICLE IX
### DISSOLUTION AND WINDING UP

9.1     Conditions of Dissolution. The Company shall dissolve upon the occurrence of any of the following events:

    A.     Upon the entry of a decree of judicial dissolution pursuant to the Act;

    B.     Upon the unanimous consent of the Membership Interests; or

    C.     The sale of all or substantially all of the assets of Company.

9.2     Winding Up. Upon the dissolution of the Company, the Company's assets shall be disposed of and its affairs wound up. The Company shall give written notice of the commencement of the dissolution to all of its known creditors.

9.3     Order of Payment of Liabilities Upon Dissolution. After determining that all the known debts and liabilities of the Company have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with their positive capital account balances, after taking into account income and loss allocations for the Company's taxable year during which liquidation occurs.

9.4     Limitations on Payments Made in Dissolution. Except as otherwise specifically provided for in this Agreement, each Member shall be entitled to look only to the assets of the Company for the return of his or her positive Capital Account balance and shall have no recourse for his or her Capital Contribution and/or share of Net Profits against any other Member except as provided in Article X.

9.5     Certificates. The Company shall file with the New York Secretary of State, a Certificate of Dissolution upon the dissolution of the Company and a Certificate of Cancellation upon the completion of the winding up of the Company's affairs.

## ARTICLE X
### INDEMNIFICATION

10.1     Indemnification of Agents. The Company shall indemnify any Member and may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, officer, employee or other agent of the Company or that, being or having been such a Member, officer, employee or other agent of the Company, he or she is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit.

## ARTICLE XI
### INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Members and the Company as follows:

11.1     Preexisting Relationship or Experience. He or she has a preexisting personal or business relationship with the Company or one or more of its officers or controlling persons, or by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he

9

or she is capable of evaluating the risks and merits of an investment in the Company and of protecting his or her own interests in connection with this investment.

11.2    No Advertising. He or she has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, article or any other form of advertising or general solicited with respect to the sale of the Membership Interest.

11.3    Investment Intent. He or she is acquiring the Membership Interest for investment purposes for his or her own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest. No other person will have any direct or indirect beneficial interest in or right to the Membership Interest.

11.4    Legal Representation. He or she has had the opportunity to consult with legal counsel before assenting to the terms of this Agreement.

## ARTICLE XII
## MISCELLANEOUS

12.1    Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements among the Members. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

12.2    Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

12.3    Interpretation. All pronouns shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the interpretation of any provision of this Agreement. Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his or her counsel.

12.4

Jurisdiction. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND RULE 327(b) OF THE NEW YORK CIVIL PRACTICE LAW AND RULES. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED IN THE CITY, COUNTY AND STATE OF NEW YORK IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING RELATED TO THIS AGREEMENT OR ANY OF THE MATTERS CONTEMPLATED HEREBY, IRREVOCABLY WAIVES ANY DEFENSE OF LACK OF PERSONAL JURISDICTION AND IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH COURT. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT THEY MAY EFFECTIVELY DO SO UNDER APPLICABLE LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

12.5    Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 12.7 of this Agreement, and that when so made shall be as if served upon him or her personally within the State of New York.

12.6    _Severability._ If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

12.7    _Notices._ Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member at the address specified in Exhibit A hereto. Any party may, at any time by giving five (5) days' prior written notice to the other Members, designate any other address in substitution of the foregoing address to which such notice will be given.

12.8    _Amendments._ All amendments to this Agreement will be in writing and signed by all of the Members.

12.9    _Multiple Counterparts._ This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. Facsimile signatures shall be valid to enforce this Agreement.

12.10    _Attorney Fees._ In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate allowed by law. For the purposes of this Section: (a) attorney fees shall include, without limitation, fees incurred in the following: (1) postjudgment motions; (2) contempt proceedings; (3) garnishment, levy, and debtor and third party examinations; (4) discovery; and (5) bankruptcy litigation and (b) prevailing party shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

12.11    _Remedies Cumulative._ The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

## THE BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK

11

IN WITNESS WHEREOF, all of the Members of Intermed Gas Products, LLC, A New York Limited Liability Company, have executed this Agreement, effective as of the date written above.

Martell, LLC

By: Michael Milea, Managing Member

Laing Holdings Corporation

By: Michael Laing, President

W. Murray Corporation

PRESIDENT

By: William Murray, President

CONSENTED TO AS TO SECTIONS 4.4 and 4.5:

Michael Laing, individually

William Murray, individually.

CAPITAL CONTRIBUTION AND ADDRESSES OF MEMBERS
AS OF NOVEMBER 30, 2005

| Member's Name | Member's Address | Member's Capital Contribution | Member's Membership Interest |
|---|---|---|---|
| Martell, LLC. | 405 Park Avenue, 15th Floor, New York, NY 10022 | $ | 1% |
| Laing Holdings Corporation | 305 Trieste Dr. Palm Beach Gardens, Florida 33418 | $ | 49 1/2% |
| W. Murray Corporation | 200 East Royal Palm Road Boca Raton, FL 33432 | | 49 ½% |

13

# AMENDED AND RESTATED

## OPERATING AGREEMENT
### FOR
### INTERMED GAS PRODUCTS, LLC
### A NEW YORK LIMITED LIABILITY COMPANY

This Operating Agreement (this "Agreement"), is made as of February 23, 2006, by and between the parties listed on the signature pages hereof (collectively referred to as the "Members" or individually as a "Member"), with reference to the following facts:

    A.    On December 1, 2005 Articles of Organization ("Articles") for INTERMED GAS PRODUCTS, LLC (the "Company"), a New York limited liability company, was filed with the New York Secretary of State.

    B.    As of November 30, 2005 the Members adopted and approved an operating agreement for the Company under the New York Limited Liability Company Law (the "Act").

    C.    The Members desire to amend and restate the operating agreement for the Company.

NOW, THEREFORE, the Members by this Agreement set forth the amended and restated operating agreement for the Company upon the terms and subject to the conditions of this Agreement.

## ARTICLE I
## ORGANIZATIONAL MATTERS

    1.1    **Name.** The name of the Company shall be "Intermed Gas Products, LLC." The Company may conduct business under those names or any other name approved by the Members.

    1.2    **Term.** The term of the Company commenced as of the date of the filing of the Articles and shall continue until terminated as hereinafter provided.

    1.3    **Office and Agent.** The Company shall continuously maintain an office and registered agent in the State of New York as required by the Act. The registered office of the Company in the State of New York is located at c/o Martell, LLC, 405 Park Avenue, 15th Floor, New York, NY 10022. The registered agent for the Company for service of process at such address is Michael Milea. The principal office of the Company shall be at 405 Park Avenue, 15th Floor, New York, New York 10022, or such other location as the Members may determine.

    1.4    **Business of the Company.** Notwithstanding the purpose of the Company which is described in the Articles, the Company shall not engage in any business other than the following without the consent of all of the Members:

        A.    the purchase from suppliers and resale of gas cylinders, valves, regulators, conserving devices and other related devices; and

        B.    such other activities directly related to the foregoing business as may be necessary or advisable in the reasonable opinion of the Members to further such business.

## ARTICLE II
### CAPITAL CONTRIBUTIONS

2.1    Capital Contributions. Each Member shall make an initial contribution to the capital of the Company in kind and in the amount shown opposite the Member's name on Exhibit A attached hereto. Except as provided in this Agreement, no Member may withdraw his or her capital contribution.

2.2    Capital Accounts. The Company shall establish an individual capital account ("Capital Account") for each Member. The Company shall determine and maintain each Capital Account in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). Upon a valid transfer of a Member's interest in the Company ("Membership Interest") in accordance with Article VI, such Member's Capital Account shall carry over to the new owner.

2.3    No Interest. The Company shall not pay any interest on capital contributions.

## ARTICLE III
### MEMBERS

3.1    Admission of Additional Members. Additional Members may be admitted with the approval of all Members. Additional Members will participate in the management, "Net Profits", "Net Losses" (as such terms are defined in Section 5.1), and distributions of the Company on such terms as are determined by the Members. Exhibit A shall be amended upon the admission of an additional Member to set forth such Member's name and capital contribution.

3.2    Withdrawals or Resignations. No Member may withdraw, retire or resign from the Company, other than in connection with a transaction permitted by Section 7 hereof.

3.3    Payments to Members. Except as specified in this Agreement or pursuant to a transaction permitted by Section 4.6, no Member or person or entity controlled by, controlling or under common control with the Member (each such person or entity is defined as an "Affiliate"), is entitled to remuneration for services rendered or goods provided to the Company. However, the Company shall reimburse the Members and their Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company, prepare the Articles and this Agreement and, as approved by the Members, for the actual cost of goods and materials used by the Company.

## ARTICLE IV
### MANAGEMENT AND CONTROL OF THE COMPANY

4.1    Management and Powers. Except as otherwise expressly provided herein, each Member shall participate in the control, management and direction of the business of the Company, and, except as otherwise expressly provided herein, all decisions or consents of Members shall be taken by majority vote, with each Member entitled to votes in accordance with its Membership Interest. By majority consent, the Members may appoint, employ, fire, or otherwise contract with any persons or entities for the transaction of business of the Company or the performance of services for or on behalf of the Company, and the Members may delegate to any such person or entity such authority to act on behalf of the Company as the Members may from time to time deem appropriate. Notwithstanding the generality of the foregoing, a majority must include the vote of Martell's Membership Interest. In the event that a vote of a majority of Membership Interests does not include the affirmative vote of Martell, it shall be deemed not to have been affirmatively voted on.

4.2    Special Bankruptcy Rule. The Company may not file for protection from its creditors under the United States Bankruptcy Code or any other federal or state statute affecting the rights of creditors generally, without the written approval of a majority in interest of the Membership Interests, and if Martell, LLC ("Martell"), for whatever reason, does

2

not hold a majority in interest of the Membership Interests then, such filing may not be made without the express written approval of Martell.

4.3    Member Approval. No annual or regular meetings of the Members are required to be held. However, if such meetings are held, such meetings shall be noticed, held and conducted pursuant to the Act. In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Act. Unless otherwise expressly provided in this Agreement, approval of the Members shall mean the majority approval of the Membership Interests

4.4    Devotion of Time. [M LCO] ("MLCO") and its principal Michael Laing ("Laing") and [WMCO] ("WMCO") and its principal William Murray ("Murray") shall devote their full time and attention to the business of the Company and Martell shall devote whatever time or effort it deems appropriate for the furtherance of the Company's business.

4.5    Competing Activities. The Members and their Affiliates may engage or invest in any activity. The Members of the Company may not engage in any transaction, competitive with the business of the Company. Expand .

4.6    Member's Responsibilities. Notwithstanding the generality of this Article IV, Martell shall have the responsibility of originating, negotiating the terms and conditions of and managing each of the financing transactions entered into by the Company. Martell shall, in its sole discretion, provide adequate financing to fund the purchase of inventory by the Company. Martell shall also give business advice to the Company, including but not limited to, inventory planning, negotiating terms with suppliers, including timing, pricing, quality control, shipping schedules, delivery schedules, Letter of Credit terms, etc., negotiate payment terms with key customers, review new hirings, meet with salesmen, attend staff meetings, review contracts, review receivables, source and engage consultants to implement software upgrades, engage accountants, bookkeepers etc., who shall report to Martell. Martell shall also provide financial and consulting services to the Company. All of the foregoing shall be governed by a separate Finance and Service Agreement between Martell, or an affiliate, and the Company. The failure by Martell to engage in any of the specified services shall not constitute a default be Martell under this Agreement or give rise to any defense to the Obligations of the Company pursuant to the Finance and Service Agreement. MLCO and WMCO shall have the responsibility of arranging for the purchase and sale of inventory.

4.7    Transactions between the Company and the Members. Notwithstanding that it may constitute a conflict of interest, the Members and their Affiliates may engage in any transaction with the Company so long as such transaction is not expressly prohibited by this Agreement and if the transaction is approved in writing by unanimous consent of the Membership Interests.

## ARTICLE V
## ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

5.1    Definitions. When used in this Agreement, the following terms shall have the meanings set forth below.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time; the provisions of succeeding law, and to the extent applicable, the Treasury Regulations.

"Company Minimum Gain" shall have the meaning ascribed to the term "Partnership Minimum Gain" in the Treasury Regulations Section 1.704-2(d).

"Member Nonrecourse Debt" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Treasury Regulations Section 1.704-2(b)(4).

3

"Member Nonrecourse Deductions" shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

"Membership Interest" shall mean the Membership Interest of a Member set forth on Exhibit "A" hereto.

"Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting at the close of each fiscal year employed on the Company's information tax return filed for federal income tax purposes.

"Nonrecourse Liability" shall have the meaning set forth in Treasury Regulations Section 1.752-1(a)(2).

"Treasury Regulations" shall mean the final or temporary regulations that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

5.2    Allocations of Net Profit and Net Loss.

A.    Net Loss. Net Loss shall be allocated to the Members in proportion to their Membership Interest. Notwithstanding the previous sentence, loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such Member's share of Company Minimum Gain that would be realized on a foreclosure of the Company's property. Any loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of losses under this Section 5.2A). Any loss reallocated under this Section 5.2A shall be taken into account in computing subsequent allocations of income and losses pursuant to this Article V, so that the net amount of any item so allocated and the income and losses allocated to each Member pursuant to this Article V, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to this Article V if no reallocation of losses had occurred under this Section 5.2A.

B.    Net Profit. Net Profit shall be allocated to the Members in proportion to their Membership Interests.

5.3    Special Allocations. Notwithstanding Section 5.2,

A.    Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 5.3A shall be made in proportion to the amounts required to be allocated to each Member under this Section 5.3A. The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f). This Section 5.3A is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

B.    Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. If there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any fiscal year, each member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 5.3B shall be made in proportion to the amounts required to be allocated to each Member under this Section

4

5.3B.  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(4). This Section 5.3B is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

C.    Nonrecourse Deductions.  Any nonrecourse deductions (as defined in Treasury Regulations Section 1.704-2(b)(1)) for any fiscal year or other period shall be specially allocated to the Members in proportion to their Membership Interests.

D.    Member Nonrecourse Deductions.  Those items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Treasury Regulations Section 1.704-2(i).

E.    Qualified Income Offset.  If a Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible.  Any special allocations of items of income and gain pursuant to this Section 5.3E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article V so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Section 5.3E to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Article V if such unexpected adjustments, allocations, or distributions had not occurred.

5.4    Code Section 704(c) Allocations.  Notwithstanding any other provision in this Article V, in accordance with Code Section 704(c) and the Treasury Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution.  Allocations pursuant to this Section 5.4 are solely for purposes of federal, state and local taxes.  As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

5.5    Distribution of Assets by the Company.  Subject to applicable law and any limitations contained elsewhere in this Agreement, Members, acting by unanimous consent, may elect from time to time to cause the Company to make distributions.  Distributions shall be first to the Members in proportion to their unreturned capital contributions until each Member has recovered his or her capital contributions, and then to the Members in proportion to their Membership Interests.

## ARTICLE VI
### TRANSFER AND ASSIGNMENT OF INTERESTS

6.1    Transfer and Assignment of Interests.  No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Membership Interest (collectively, "transfer") except with the prior approval of a majority in interest of all Membership Interests, which approval may be given or withheld in the sole discretion of the Members.  Notwithstanding the generality of the foregoing, Martell may transfer its ownership to another entity, with substantially similar ownership, provided that such transfer shall not have a Material Adverse Effect on the business as such term is defined in the Finance and Service Agreement between the parties dated October  , 2005.  Additionally, notwithstanding the generality of the foregoing, a majority must include the vote of Martell's Membership Interest.  In the event that a vote of a majority of Membership Interests does not include the affirmative vote of Martell, it shall be deemed not to have been affirmatively voted on.

6.2    Substitution of Members.  A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) consent of the Members is given in accordance with Section 6.1, (ii) such person executes an instrument satisfactory to the Members accepting and adopting the terms and provisions of this Agreement, and (iii) such person pays any reasonable expenses in connection with his or her admission as a new Member.  The admission of a substitute Member shall not release the Member who assigned the Membership Interest from any liability that such Member may have to the Company.  Notwithstanding the generality of the foregoing, Martell may transfer its interest, without the consent of any other Member, to its source of funding.

6.3    Transfers in Violation of this Agreement and Transfers of Partial Membership Interests.  Upon a transfer in violation of Article VI or Article VII, the transferee shall have no right to vote or participate in the management of the Company or to exercise any rights of a Member.  Such transferee shall only be entitled to receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor would otherwise be entitled.  Notwithstanding the immediately preceding sentences, if, in the determination of the remaining Members, a transfer in violation of this Article VI would cause the termination of the Company under the Code, in the sole discretion of the remaining Members, the transfer shall be null and void.

## ARTICLE VII
## SPECIAL PROVISIONS

7.1    <u>Distributions.</u>    Notwithstanding any other provisions in this Agreement, the Company shall make distributions of cash flow as follows:

A.    <u>While Note from Laing and Murray is Outstanding.</u>    While there is an outstanding note from Laing and Murray (collectively the "Stockholders"), to Informed Gas Products, Incorporated ("IGI") then, on a bimonthly basis, the Company shall distribute one hundred percent (100%) of its cash flow to its Members in accordance with their Membership Interests. MLCO and WMCO each agrees to in turn distribute one hundred percent (100%) of said cash flow to the Stockholders, who in turn agree to use 100% of said cash flow to repay their note to IGI and cause IGI to use one hundred percent (100%) of such cash flow to pay outstanding third party payables of IGI, until such obligations are paid in full.

B.    <u>After Note from Laing and Murray is Paid.</u>    After the note from the MB Stockholders to IGI is paid in full, then the Company, on a bimonthly basis, shall distribute an amount sufficiently adequate so that the member may pay their federal, state and local income taxes on K-1 income from the Company.

7.2    <u>Martell's Option to Purchase.</u>

A.    <u>First Option.</u>    Martell shall have an option to purchase fifty percent (50%) of each of MLCO's and WMCO's Membership Interest in the Company on February 28, 2007, each at a purchase price equal to three and one half (3½) times the cashflow of the Company for the Fiscal Year ended November 30, 2006 multiplied by .25 (representing approximately 25% of the Membership Interests of the Company). Payment shall be made in cash at the time of closing.

B.    <u>Second Option.</u>    Martell shall have an option to purchase fifty percent (50%) of each of MLCO's and WMCO's Membership Interest in the Company on February 28, 2008, each at a purchase price equal to three and one half (3½) times the cashflow of the Company for the Fiscal Year ended November 30, 2007 multiplied by .25 (representing approximately 25% of the Membership Interests of the Company). Payment shall be made in cash at the time of closing.

C.    <u>Third Option.</u>    At any time prior to November 30, 2006 Martell shall have the option to purchase twenty-five percent (25%) of each of MLCO's and WMCO's Membership Interests in exchange for agreeing to modify the First and Second Options described above as follows:

1.    The First Option shall be modified so that the relevant fiscal year ending is January 31, 2007, the Closing Date is April 30, 2007 and the calculation shall be three and one half (3 1/2) times the cashflow of the Company multiplied by .1875 (representing approximately 18.75% of the Membership Interests of the Company).

2.    The Second Option shall be modified so that the relevant fiscal year ending is January 31, 2008, the Closing Date is April 30, 2008 and the calculation shall be three and one half (3 1/2) times the cashflow of the Company multiplied by .1875 (representing approximately 18.75% of the Membership Interests of the Company).

7.3    <u>Security Agreement.</u>    MLCO and WMCO shall enter into a security or pledge agreement with Martell pledging their Membership Interests in the Company to Martell as additional security for the Advances made by Martell pursuant to the Finance and Service Agreement.

## ARTICLE VIII
### ACCOUNTING, RECORDS, REPORTING BY MEMBERS

8.1     Books and Records. The books and records of the Company shall be kept in accordance with the accounting methods followed for federal income tax purposes. The Company shall maintain at the principal office of the Company all of the following:

A.     A current list of the full name and last known business or residence address of each Member set forth in alphabetical order, together with the capital contributions, capital account and Membership Interest of each Member;

B.     A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

C.     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

D.     A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

E.     Copies of the financial statements of the Company, if any, for up to the six (6) most recent fiscal years; and

F.     The Company's books and records as they relate to the internal affairs of the Company, if any, for up to at least the current and past four (4) fiscal years.

8.2     Reports. The Company shall cause to be filed, in accordance with the Act, all reports and documents required to be filed with any governmental agency. The Company shall cause to be prepared at least annually, information concerning the Company's operations necessary for the completion of the Members' federal and state income tax returns. The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each taxable year (i) such information as is necessary to complete the Members' federal and state income tax or information returns and (ii) a copy of the Company's federal, state, and local income tax or information returns for the year.

8.3     Bank Accounts. The Members shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other person.

8.4     Tax Matters for the Company. Martell is designated as "Tax Matters Partner" (as defined in Code Section 6231), to represent the Company (at the Company's expense) in connection with all examination of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith.

8.5     Reports to Members. The Company shall give financial reports to each member, monthly 30 days after the end of each month and annually, 75 days after the end of each year. Martell shall designate the preparer of such financial statements.

8.6     Accountant. The certified public accountants for the Company shall be Rachlin & Cohen or such other certified public accountants as chosen by Martell.

## ARTICLE IX
## DISSOLUTION AND WINDING UP

9.1     Conditions of Dissolution.  The Company shall dissolve upon the occurrence of any of the following events:

    A.     Upon the entry of a decree of judicial dissolution pursuant to the Act;

    B.     Upon the unanimous consent of the Membership Interests; or

    C.     The sale of all or substantially all of the assets of Company.

9.2     Winding Up.  Upon the dissolution of the Company, the Company's assets shall be disposed of and its affairs wound up.  The Company shall give written notice of the commencement of the dissolution to all of its known creditors.

9.3     Order of Payment of Liabilities Upon Dissolution.  After determining that all the known debts and liabilities of the Company have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with their positive capital account balances, after taking into account income and loss allocation for the Company's taxable year during which liquidation occurs.

9.4     Limitations on Payments Made in Dissolution.  Except as otherwise specifically provided for in this Agreement, each Member shall be entitled to look only to the assets of the Company for the return of his or her positive Capital Account balance and shall have no recourse for his or her Capital Contribution and/or share of Net Profits against any other Member except as provided in Article X.

9.5     Certificates.  The Company shall file with the New York Secretary of State, a Certificate of Dissolution upon the dissolution of the Company and a Certificate of Cancellation upon the completion of the winding up of the Company's affairs.

## ARTICLE X
## INDEMNIFICATION

10.1     Indemnification of Agents.  The Company shall indemnify any Member and may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, officer, employee or other agent of the Company or, that, being or having been such a Member, officer, employee or agent, he or she is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit.

## ARTICLE XI
## INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Members and the Company as follows:

11.1     Preexisting Relationship or Experience.  He or she has a preexisting personal or business relationship with the Company or one or more of its officers or controlling persons, or by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he or she

is capable of evaluating the risks and merits of an investment in the Company and of protecting his or her own interest connection with this investment.

11.2   _No Advertising_. He or she has not seen, received, been presented with, or been solicited by a leaflet, public promotional meeting, article or any other form of advertising or general solicited with respect to the sale the Membership Interest.

11.3   _Investment Intent_. He or she is acquiring the Membership Interest for investment purposes for his her own account only and not with a view to or for sale in connection with any distribution of all or any part of Membership Interest. No other person will have any direct or indirect beneficial interest in or right to the Members Interest.

11.4   _Legal Representation_. He or she has had the opportunity to consult with legal counsel before assenti to the terms of this Agreement.

## ARTICLE XII
## MISCELLANEOUS

12.1   _Complete Agreement_. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace an supersede all prior written and oral agreements among the Members. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

12.2   _Binding Effect_. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

12.3   _Interpretation_. All pronouns shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the interpretation of any provision of this Agreement. Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his or her counsel.

12.4

_Jurisdiction_. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND RULE 327(b) OF THE NEW YORK CIVIL PRACTICE LAW AND RULES. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED IN THE CITY, COUNTY AND STATE OF NEW YORK IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING RELATED TO THIS AGREEMENT OR ANY OF THE MATTERS CONTEMPLATED HEREBY, IRREVOCABLY WAIVES ANY DEFENSE OF LACK OF PERSONAL JURISDICTION AND IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH COURT. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT THEY MAY EFFECTIVELY DO SO UNDER APPLICABLE LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

12.5    Service. Each Member further agrees that personal jurisdiction over him or her may be effected service of process by registered or certified mail addressed as provided in Section 12.7 of this Agreement, that when so made shall be as if served upon him or her personally within the State of New York.

12.6    Severability. If any provision of this Agreement or the application of such provision to any person circumstance shall be held invalid, the remainder of this Agreement or the application of such provision persons or circumstances other than those to which it is held invalid shall not be affected thereby.

12.7    Notices. Any notice to be given or to be served upon the Company or any party hereto in connecti with this Agreement must be in writing (which may include facsimile) and will be deemed to have been giv and received when delivered to the address specified by the party to receive the notice. Such notices will given to a Member at the address specified in Exhibit A hereto. Any party may, at any time by giving five days' prior written notice to the other Members, designate any other address in substitution of the foregoi address to which such notice will be given.

12.8    Amendments. All amendments to this Agreement will be in writing and signed by all of the Membe

12.9    Multiple Counterparts. This Agreement may be executed in two or more counterparts, each of whi shall be deemed an original, but all of which shall constitute one and the same instrument. Facsimile signatu shall be valid to enforce this Agreement.

12.10    Attorney Fees. In the event that any dispute between the Company and the Members or among t Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recov from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing part including, without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to hav accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted judgment. Any judgment or order entered in such action shall contain a specific provision providing for th recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interes from the date of the breach at the maximum rate allowed by law. For the purposes of this Section: (a) attorne fees shall include, without limitation, fees incurred in the following: (1) postjudgment motions; (2) contemp proceedings; (3) garnishment, levy, and debtor and third party examinations; (4) discovery; and (5) bankrupt litigation and (b) prevailing party shall mean the party who is determined in the proceeding to have prevailed o who prevails by dismissal, default or otherwise.

12.11    Remedies Cumulative. The remedies under this Agreement are cumulative and shall not exclude an other remedies to which any person may be lawfully entitled.

THE BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, all of the Members of Intermed Gas Products, LLC, A New York Limited Liability Company, have executed this Agreement, effective as of the date written above.

Martell, LLC

By: Michael Milea, Managing Member

[MLCO]

By: Michael Laing, President

[WMCO]

By: William Murray, President

CONSENTED TO AS TO SECTION 4.4:

Michael Laing, Individually

William Murray, Individually

12

CAPITAL CONTRIBUTION AND ADDRESSES OF MEMBERS
AS OF OCTOBER 1, 2005

| Member's Name | Member's Address | Member's Capital Contribution | Member's Membership Interest |
|---|---|---|---|
| Martell, LLC. | 405 Park Avenue, 15th Floor, New York, NY 10022 | $ | 1% |
| [MLCO] | 4100 N. Powerline Road, U-4 Pompano Beach, Florida 33073 | $ | 49 1/2% |
| [WMCO] | 4100 N. Powerline Road, U-4 Pompano Beach, Florida 33073 | | 49 1/2% |

13

FORBEARANCE AGREEMENT
BY AND BETWEEN

INTERMED GAS PRODUCTS, LLC,

LAING HOLDINGS CORPORATION,

MICHAEL LAING,


AND

MARTELL, LLC


June 28, 2007

- 1 -

AGREEEMENT made this 28th day of June, 2007, by and between INTERMED GAS PRODUCTS, LLC,("IGP"), a New York limited liability company, LAING HOLDINGS CORPORATION, a Florida corporation ("MLCO"),and MICHAEL LAING individually ( "LAING"), and MARTELL, LLC, A New York limited liability company (MARTELL")

WHEREAS IGP,MLCO and LAING, , acknowledge and agree that from and after April 13, 2004, MARTELL has at all times has more than fulfilled all of its obligations under its various agreements with Intermed Gas Products Corporation, IGP, MLCO, LAING, including but not limited to funding Intermed Gas Products Corporation and IGP, providing senior management, overseeing operations, analyzing the business structure and business planning of IGP, creating financial and strategic planning, conducting and participating in business meetings, planning inventory purchases (including pricing, logistics, letters of credit arrangements , and assisting product sourcing in the USA and from China), and

WHEREAS IGP, MLCO, and LAING, , acknowledge that they are in default of their obligations under their respective existing agreements with MARTELL, and

WHEREAS to induce MARTELL to forbear from taking immediate action against them on account of said defaults, IGP, MLCO and LAING , are willing to enter into the following agreement,

THE PARTIES HERETO AGREE AS FOLLOWS:

1. Statement of Account. As of May 31, 2007, the advances from MARTELL to IGP total $ 1,120,000.00.

2. Statement of Transferred Assets and Liabilities. IGP, MLCO, and LAING, , each reaffirm, warrant, and represent to MARTELL that (a) good title to all the assets of Intermed Gas Products Corporation, including the name "Intermed Gas Products", were validly transferred to LAING and WILLIAM MURRAY ("MURRAY") from Intermed Gas Products Corporation, pursuant to the Asset Purchase Agreement between Intermed Gas Products Corporation and LAING and MURRAY,WMCO dated November 30, 2005, then validly transferred by these individuals to MLCOO and , and then validly transferred to IGP which is now the sole owner of all said assets, and (b) the only liability of Intermed Gas Products Corporation assumed by IGP through the foregoing transactions is the obligation of Intermed Gas Products Corporation to MARTELL pursuant to the Finance and Service Agreement it had with MARTELL, (c) the Florida limited liability company "Intermed Gas Products,

- 2 -

LLC, formed in October, 2005, by Laing AND MURRAY as members, never did any business, does not now do any business, , and (d) MLCO LAING, , each agree not to use the name or designation "Intermed Gas Products", directly or indirectly, in any business in which they are involved, whether as principals, investors, equity holders, consultants, employees, agents, representatives, or otherwise.

3. <u>Membership Interest in IGP</u>. The parties acknowledge that as of May 31 2007, the ownership of IGP is intended to be and is as follows:

|  |  |
|---|---|
| LAING | 32.5 % |
| 972 Irrevocable Trust | 57.5% |
| MERLIN | 10 % |

4. <u>Limitation of Guaranty.</u> The Continuing Guaranties of LAING and MURRAY executed November 30, 2005, shall continue to apply to all amounts due and owing or which may become due and owing to MARTELL by IGP up to and including July 31, 2006, but not to any amounts which may become due and owing to MARTELLL from IGP thereafter.

5. <u>Release.</u> Each of IGP, MLCO, LAING, , for itself/ himself and their respective executors, administrators, successors, and/or assigns, hereby release MARTELL and each of its managers and members and their respective heirs, executors, administrators, successors and assigns, from all actions, causes of actions, suits, debts, promises, claims, damages, and demands of any kind whatsoever, in law or equity, that each of the releasers ever had, or now has, or hereafter shall or may have , for, upon, or by reason of any matter, cause, or thing whatsoever from the beginning of the world to the date of this release.

6. <u>Waiver of Conflict of Interest.</u> Without affecting the general applicability of Section 5, IGP, MLCO, LAING, specifically agree to waive and release any claim against MARTELL based on a conflict of interest arising from MARTELL'S acting as a member and manager of IGP while also funding IGP. Said waiver shall continue and be operative as long as MARTELL has a relationship with any of the parties hereto.

7. <u>Indemnity.</u> Each of IGP, MLCO, LAING, , shall indemnify, defend and hold harmless MARTELL and each of its managers and members (the "Indemnified Parties ") against all losses, damages, claims or expenses incurred by any of them, including without limitation, attorney's fees for consultation and/or litigation defense, judgments, fines and amounts paid in settlement, in connection with any past, present, or future claim, action, suit, or proceeding, arising from or relating to any acts, omissions or alleged acts or omissions of, or arising out of the activities of Intermed Gas Products Corporation, IGP, MLCO, LAING, , or MURRAY or the relationship of the Indemnified Parties to Intermed Gas Products Corporation, IGP, MLCO, LAING, , or MURRAY, and/or the acts or omissions of the Indemnified Parties as members or managers of IGP or in furtherance of the interests of IGP.

8. <u>Governing Law.</u> This Agreement in its interpretation and application shall be

- 3 -

governed by the law of the State of New York and any action at law or equity relating thereto shall be brought only in the federal or State courts sitting in New York State.

9. Amendment. This Agreement may only be amended, modified or otherwise changed by a writing signed by all the parties hereto.

10. Legal Review. Prior to executing this Agreement all the parties hereto have had ample time and opportunity and have been urged to review this Agreement with their respective attorneys.


WHEREFORE, the parties hereto have executed this Agreement on the date first above written.

INTERMED GAS PRODUCTS, LLC

By: _____

LAING HOLDINGS CORPORATION

By: _____

_____
MICHAEL LAING

MARTELLA, LLC

By: _____

- 4 -

Index #:

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X

972 IRREVOCABLE TRUST and
INTERMED GAS PRODUCTS LLC.,

Plaintiffs,

-against-

MICHAEL LAING, ROBERTA PUGLIESE,
LAING HOLDINGS CORPORATION and
INTERACTIVE MEDICAL TECHNOLOGIES, CORP.

Defendants.

-------------------------------------------------------------------X

## SUMMONS AND COMPLAINT

## GOLDBERG & RIMBERG COUNSELORS AT LAW, PLLC
**Attorneys for Plaintiffs**
115 Broadway- 3rd Floor
New York, New York 10006
(212) 697-3250

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

——————————————————————X

972 IRREVOCABLE TRUST and
INTERMED GAS PRODUCTS, LLC,

      Plaintiffs,                                             Index No.:  105430/08

-against-

MICHAEL LAING, ROBERTA A. PUGLIESE,
LAING HOLDINGS CORPORATION and
INTERACTIVE MEDICAL TECHNOLOGIES, CORP.,

      Defendants.

——————————————————————X

### NOTICE OF FILING NOTICE OF REMOVAL

TO:  Clerk of the above-entitled Court

      PLEASE TAKE NOTICE that a Notice of Removal in the above-styled cause of action

was duly filed with the Clerk of the United States District Court for the Southern District of New

York on May 28, 2008.  A true and correct copy of the Notice of Removal is attached hereto as

an exhibit and is being filed herewith pursuant to 28 U.S.C. §1331, 1337, 1441(b) and 1446(d)

which provides that upon removal "the state court shall proceed no further unless and until the

case is remanded."

### CERTIFICATE OF SERVICE

      WE HEREBY CERTIFY that a true copy of the foregoing was faxed and mailed this

28th day of May, 2008 to all parties on the attached service list.

                            **JEFFREY M. GLOTZER, P.A.**
                            Attorney for Defendants Michael Laing,



EXHIBIT "B"

Roberta A. Pugliese, Laing Holdings
Corporation and Interactive Medical
Technologies, Corp.
6111 Broken Sound Parkway, NW
Suite 330
Boca Raton, FL 33487
Phone: (561) 443-1994
Fax: (561) 431-3104

By: _____
JEFFREY M. GLOTZER
New York State Bar No. 2330447

2

**Service List**

Robert L. Rimberg
Goldberg & Rimberg
Counselors at Law PLLC
*Attorneys for Plaintiffs*
115 Broadway, 3rd Floor
New York, New York 10006