UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────────

972 IRREVOCABLE TRUST and
INTERMED GAS PRODUCTS, LLC,                    Case No.:  08-CV-4907 RPP-HP
                                               ECF CASE

                 Plaintiffs
v.

MICHAEL LAING, ROBERTA PUGLIESE,
LAING HOLDINGS CORPORATION and
INTERACTIVE MEDICAL TECHNOLGIES, CORP.
            Defendants.
────────────────────────────────────

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.......................................................1

ARGUMENT
STANDARD FOR PRELIMINARY INJUNCTION............................3

PLAINTIFFS APPLICATION FOR A PRELIMINARY
INJUNCTION/TEMPORARY RESTRAINING ORDER
SHOULD BE DENIED AS PLAINTIFFS HAVE NOT
SUFFICIENTLY ALLEGED OR ILLUSTRATED A BASIS
FOR THIS COURT TO OBTAIN PERSONAL JURISDICTION
OVER THE DEFENDANTS.........................................................3

PLAINTIFFS' INEXCUSABLE DELAY IN MOVING
FOR PRELIMINARY RELIEF REQUIRES DENIAL OF ITS'
MOTION...............................................................................9

MONEY DAMAGES WOULD ADEQUATELY COMPENSATE
PLAINTIFF...........................................................................13

PLAINTIFFS' APPLICATION SHOULD BE DENIED AS
A RESULT OF THEIR OWN UNCLEAN HANDS............................16

IF AN INJUNCTION IS ENTERED, A SUBSTANTIAL BOND
SHOULD BE REQUIRED.........................................................17

CONCLUSION......................................................................17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

972 IRREVOCABLE TRUST and
INTERMED GAS PRODUCTS, LLC,                    Case No.:  08-CV-4907 RPP-HP
                                               ECF CASE

          **Plaintiffs**

v.

MICHAEL LAING, ROBERTA PUGLIESE,
LAING HOLDINGS CORPORATION and
INTERACTIVE MEDICAL TECHNOLGIES, CORP.
        **Defendants.**

---

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

Defendants, MICHAEL LAING (hereinafter referred to as "LAING"), ROBERTA PUGLIESE (hereinafter referred to as "PUGLIESE"), LAING HOLDINGS CORPORATION (hereinafter referred to as "LHC"), INTERACTIVE MEDICAL TECHNOLGOIES, CORP. (hereinafter referred to as "IMT")(collectively hereinafter referred to as "Defendants"), by and through their undersigned counsel, hereby file their Memorandum of Law in Opposition to Plaintiffs' Application for Preliminary Injunction and Temporary Restraining Order and state as follows:

### PRELIMINARY STATEMENT

On April 16, 2008, Plaintiffs filed a Complaint in the Supreme Court of the State of New York against Defendants that initiated the instant action. (DE# 1, Exhibit# 1) (hereinafter referred to as "the Complaint") The Complaint is a multi-count Complaint seeking monetary damages with the exception of a Count for an Accounting, which seeks equitable relief. (DE# 1, Exhibit# 1)  The Complaint alleges no basis for personal jurisdiction as to Defendants LHC, Pugliese or IMT.  (DE#

1

1, Exhibit# 1) On May 28, 2008, Defendants filed a Notice of Removal, removing the case to this Court. (DE# 1)

On June 3, 2008, Plaintiffs filed their Memorandum of Law in Support of Order to Show Cause. (DE# 14) (hereinafter referred to as "Memo in Support"). In their Memo in Support, Plaintiffs do not mention any basis for this Court to obtain personal jurisdiction over any of the Defendants. (DE# 14). In further support of their application for an Order to Show Cause, Plaintiffs filed a Supplemental Declaration of Joel S. Schneck, in addition to the Affidavits of Michael Milea and Laurie Misner. (DE#'s 15, 16 and 17 respectively) (hereinafter collectively referred to as "supporting affidavits") The supporting affidavits do not refer to any basis that permits this Court to obtain personal jurisdiction over the Defendants. On the same day, this Court entered an Order to Show Cause requiring Defendants to show cause, on 6/17/2008 at 09:30 AM before Judge Robert P. Patterson, as to why Orders should not be entered herein: (a) pursuant to F.R.C.P.R. 65(a) and (b) granting a temporary restraining order and preliminary injunction enjoining Michael Laing, Laing Holdings Corporation, Robert A Pugliese and Interactive Medical Technology, Corp. from purchasing, selling promoting, and/or distributing gas cylinders, valves, regulators, conserving devices, fingertip pulse oximeters and other related devices and from otherwise competing with Intermed Gas Products, LLC's business; and (b) granting such other and further relief as to this Court seems just and proper. (DE# 7)

Finally, on the same day, Defendants filed a Motion to Dismiss Plaintiff's Complaint or in the Alternative, Motion to Transfer Venue to the United States District Court, Southern District of Florida together with a Supporting Memorandum of Law. (DE#'s 18, 19 respectively) (hereinafter referred to as "Motion to Dismiss"). Among other things, Plaintiffs moved to Dismiss Plaintiffs'

2

Complaint based upon lack of personal jurisdiction over some of the Defendants, improper venue and failure to state a claim. (DE# 19) Defendants' filed this Memorandum of Law in Opposition to Plaintiffs' Memo in Support and the Supporting Affidavits.

## ARGUMENT

### Standard for Preliminary Injunction.

A preliminary injunction is an extraordinary and drastic measure that should not be routinely granted. *Medical Society of the State of New York v. Toia, 560 F.2d 535, 538 (2d Cir. 1977); ImOn, Inc. v. ImaginOn, Inc. 90 F. Supp. 2d 345 , 349 (S. Y. 2000).* Although the parties disagree as to whether one should issue in this case, the standard for granting a preliminary injunction is undisputed. As Plaintiffs acknowledge in their Memo in Support, they must establish as the moving party, "(a) that the injunction is necessary to prevent irreparable harm and (b) either that (1) it is likely to success on the merits of the underlying claim or (2) there are sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tips decidedly towards the movant." (See Plaintiffs' Memo in Support, pg. 6). Plaintiffs have not made either showing here, and certainly have not established their entitlement to the extraordinary relief they are seeking.

## PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION/TEMPORARY RESTRAINING ORDER SHOULD BE DENIED AS PLAINTIFF'S HAVE NOT SUFFICIENTLY ALLEGED OR ILLUSTRATED A BASIS FOR THIS COURT TO OBTAIN PERSONAL JURISDICTION OVER DEFENDANTS

As an initial matter, there are **no** factual allegations in the Complaint nor exhibits attached thereto, the Memo in Support or Supporting Affidavits to establish personal jurisdiction over Defendants Pugliese or IMT, and indeed none of the traditional bases for personal jurisdiction are

3

present as to those defendants. Nor can there be a finding of general or specific jurisdiction under a "minimum contacts" with regard to the claim(s) alleged against those Defendants.

"It is basic that the burden of proving jurisdiction is upon the party who asserts it and that he must show by the complaint and supporting affidavits the essential requirements of the jurisdictional statute." *Lehigh Valley Indus., Inc. v. Birenbaum, 527 F .2d 87, 92 (2d Cir. 1975)*. Moreover, "[a] court must have *in personam* jurisdiction over a party before it can validly enter even an interlocutory injunction against him." *Visual Sciences, Inc. v. Integrated Communications Inc., 660 F.2d 56, 59 (2d Cir. 1981)*. For these purposes, "[a] *prima facie*showing of jurisdiction will not suffice." Rather, [w]here a challenge to jurisdiction is interposed on an application for a preliminary injunction "[t]he plaintiff is required to adequately establish that there is at least a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits." Id. (quoting *Industrial Electronics Corp. v. Cline, 330 F.2d 480, 482 (3d Cir. 1964)*. The Complaint only references a conclusory allegation regarding personal jurisdiction as to Defendant Laing. (DE# 1, par. 3) These allegations are insufficient to warrant a finding that Plaintiff has a likelihood of establishing that the Court has personal jurisdiction over Defendants Pugliese, IMT and for purposes of this application, LHC and Laing.

First, nothing in Plaintiff's allegations suggests a basis for the exercise of general jurisdiction. Section 301 of the New York's Civil Practice Laws and Rules ("CPLR") permits the exercise of general jurisdiction over a non-domiciliary only if the defendant is "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990) (citations omitted)*.

4

Moreover, a conclusory and unsupported allegation of this nature, such as the one made in regard to Defendant Laing is insufficient to make even a *prima facie* showing of jurisdiction that will be able to survive a motion to dismiss in the face of the evidence that the Defendants have presented to the effect that they do not regularly do business in New York. *See Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 196-97 (2d Cir. 1990)*. 20 Second, *Section 302(a)* of the *CPLR*, insofar as relevant here, permits the exercise of specific jurisdiction over a non-domiciliary who, in person or through an agent, (1) "transacts any business within the state," or (2) "commits a tortious act within the state." Personal jurisdiction under *section 302(a)* exists only "[a]s to a cause of action arising from any of the acts enumerated in this section." As stated, in Plaintiffs' Memorandum in Support or the Supporting Affidavits, no reference is made on the issue of personal jurisdiction. Moreover, even if Defendants transacted business in New York, there would have to be a "substantial nexus" between the business allegedly transacted and the cause of action sued upon. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F .2d 55, 59-60 (2d Cir. 1985)*.

In the instant action, there are *no* allegations that Defendants Pugliese or INT have engaged in any significant activities in New York or created continuing obligations between themselves and New York residents. *See Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 109 (1987)* ("[j]urisdiction is proper where the contact proximately results from the actions by the defendant himself that create a substantial connection with the forum state") (citations omitted); *Burger King, 471 U.S. at 475-476* (a defendant has purposefully availed himself of the benefits of a forum if he has deliberately 'engaged in significant activities within a state or has created continuing obligations' between himself and the residents of the forum.' "); *Tsegaye v. Impol Alum. Corp., 2003 U.S. Dist. LEXIS 1397, **17-18 (S.D.N.Y. Jan. 30, 2003)* (dismissing claim against non-domiciliary

5

as there was no statutory basis for jurisdiction in New York). As an initial matter, it is respectfully submitted that there can be no basis for personal jurisdiction as Defendants Pugliese or INT.

Even if Plaintiffs had alleged that Defendants Pugliese and INT have transacted business in New York systematically and regularly, the Court would have to make a further inquiry. To determine whether a defendant is "doing business" in New York, the court must "analyze a defendant's connections to the forum state 'not for the sake of contact-counting, but rather for whether such contacts show a continuous, permanent and substantial activity in *New York.*' " *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990) (emphasis added), citing Weinstein, Korn & Miller, NEW YORK CIVIL PRACTICE, ¶ 301.16; Gross v. Bare Escentuals, Inc., 2005 U.S. Dist. LEXIS 6570, *6 (S.D.N.Y. 2005)* (trademark dispute against California corporations dismissed for lack of personal jurisdiction). There are no factual allegations regarding Defendants Pugliese or INT activities in New York and no allegation that those defendants engaged in affirmative conduct promoting the transaction of business in New York. Defendants Pugliese and INT do not have sufficient contacts with the state to be subject to general jurisdiction in New York (See affidavit of Roberta Pugliese attached hereto as Exhibit "A", "Pugliese Aff.").

Neither is there any basis for jurisdiction under New York's "long-arm" statute, *CPLR § 302. See also International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)* (under the Supreme Court's due process jurisprudence, personal jurisdiction depends on whether defendants have sufficient "minimum contacts" with New York, such that maintaining the suit "does not offend traditional notions of fair play and substantial justice."); *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)* (the purpose of the "minimum contacts" requirement is to ensure that states do not reach out beyond the limits of sovereignty and to provide defendants with fair warning as to when an

6

activity may subject them to the jurisdiction of a foreign sovereign).

Because the claims arose without any alleged contact between defendants and New York, the exercise of specific jurisdiction here would be manifestly improper. All claims against defendants Pugliese and INT should be dismissed pursuant to *Fed. R. Civ. P. 12(b)(2)* (lack of personal jurisdiction).

As stated, Plaintiffs do not allege a single ground for personal jurisdiction as it relates to Defendants LHC, Pugliese or IMT. Assuming arguendo they raised personal jurisdiction by virtue of attempting to connect Pugliese or IMT to the forum selection clause of the Operating Agreements attached to the Complaint, the aforementioned clause does not confer personal jurisdiction over Pugliese or IMT.

"While forum selection clauses are regularly enforced, …[a] court must first determine that the existence of the clause was reasonably communicated to the parties." *D.H. Blair, 462 F.3d at 103* [internal citations omitted]; *Phillips, 494 F.3d at 383* ("the First inquiry is whether the clause was reasonably communicated to the party resisting enforcement."). Generally, a forum selection clause will not bind a non-party. Certain courts have been willing to bind non-parties to forum selection clauses, but only where the party is so closely related to the dispute that it becomes foreseeable that it will be bound. *Maritime Insurance Co. Ltd. V. M/V Sea Harmony, 1998 WL 21477 at *2 [SDNY, Stein, J.]*.

Here, Plaintiffs do not allege in the Complaint, their Memorandum in Support or their Supporting Affidavits that Pugliese nor IMT was a party to any of the Operating Agreements; Pugliese or IMT did not negotiate the Operating Agreements, are not parties to them, and never saw them or was aware of their existence until this action was instituted. Hence, the forum selection

7

clause was not "reasonably communicated" to her, and Pugliese not IMT are bound by it.  *See D.H.*
*Blair, 462 F.3d at 103*. Thus, the sole basis for personal jurisdiction that possibly exist for Plaintiffs
as it relates to Pugliese or IMT fails.

Moreover, by its very terms, the forum selection clause does not apply to, not bind Pugliese
or IMT. Forum selection clauses are not interpreted expansively.  The scope of the forum selection
clause is a contractual question that requires the courts to interpret the clause and, where ambiguous,
to consider the intent of the parties.  Whether or not a forum selection clause applies depends on
what the specific clause at issue says.  *Phillips, 494 F.3d 378, 389 (2d Cir. 2007) (internal citations*
*omitted)*.

The Amended and Restated Operating Agreement clearly states: "Each of the parties hereto
hereby irrevocably submits to the exclusive jurisdiction of the Federal and State Courts located in the
City, County and State of New York in connection with any suit, action or proceeding related to this
agreement or of any matters contemplated hereby…." As is clear on the signature page, Pugliese nor
IMT were parties to this Operating Agreement. (Exhibit "B")

The Amended and Restated Operating Agreement goes on to state: "11.4 Legal
Representation. He or she has had the opportunity to consult with legal counsel before assenting to
the terms of this agreement."   (Exhibit "B") Once again, Pugliese nor IMT were involved in the
negotiations, were not parties, and therefore did not have the opportunity to consult with legal
counsel with respect to this document.  (Exhibit "A") Accordingly, neither Pugliese or IMT can be
subject to the forum selection clause; therefore, Plaintiffs hypothetically sole basis for this Court's
Personal Jurisdiction fails with respect to Pugliese or IMT.

8

## PLAINTIFFS' INEXCUSABLE DELAY IN MOVING FOR PRELIMINARY RELIEF REQUIRES DENIAL OF ITS MOTION

Delay in moving for preliminary relief undercuts any assertion that the movant will suffer irreparable injury. *Tough Traveler Ltd. v. Outbound Products, 60 F.3d 964, 968 (2d Cir. 1995); T.J. Smith and Nephew Ltd. v. Consolidated Med. Equip.,Inc., 821 F.2d 646 (Fed. Cir. 1987) (finding that delay militated against thefinding of irreparable injury); Citibank, N.A. v. Citytrust, 756 F.2d 273, 277 (2dCir. 1985)*; (stating that "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury"). Consequently, delay in seeking preliminary relief standing alone can warrant denial of a motion for preliminary injunction. *Tough Traveler, 60 F.3d at 968* (finding that delay "standing alone... precludes the granting of preliminary injunctive relief"); *The Media Group, Inc. v. Ontel Products Corp., No. Civ. 300 Cv. 2034, 2001 WL 169776, *4 (D. Conn. Feb. 14,2001)* (delay of two months after bringing an action warranted a finding of no irreparable injury and denial of a motion for preliminary relief); *Gidatex, S.R.L. v Campaniello Imports, Ltd., 13 F. Stipp. 2d 417, 419 (S.D.N.Y. 1998)* (stating that even brief delays may warrant denial of a preliminary injunction); *Zell/MerrillLynch Real Estate Opportunity Partners, No. 96 Civ. 1445, 1996 WL 125643, *7 (S.D.N.Y. Mar. 21, 1996)* (finding that the delay demonstrated the lack of irreparable harm and, therefore, denying the motion for preliminary injunction).

In view of the drastic nature of a preliminary injunction and the heavy burden borne by a movant, an unexcused delay of even a few months justifies denial of a motion for a preliminary injunction. *Transperfect Translations International, Inc. v. Merrill Corp., No. 03 Civ. 10146, 2004 WL 2725032, *4 (S.D.N.Y. Nov. 30, 2004), aff'd, 2005 WL 3452448 (2d Cir. Dec. 16, 2005)* (noting

9

that "courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months"); *Steinburg v. Quinten Publishing Ltd., No. 98 Civ. 3348, 1999 WL 1018062, *2 (S.D.N.Y. Nov. 8, 1999)* (finding that delay of four months warranted denial of preliminary injunction motion); *Nina Ricci, S.A.R.L. v. Gemcraft Ltd.,612 F. Supp. 1520 (S.D.N.Y. 1985)* (finding that delay of six weeks in seeking a preliminary injunction weighed against a finding of irreparable injury). This is true even in actions to enforce intellectual property rights. Delay undercuts any presumption of irreparable injury. *Citibank, N.A., 756 F.2d at 276* (finding that delay indicates the absence of the urgent need to protect the movant's rights); *American Permahedge, Inc. v. Barcana, Inc., 857 F. Supp. 308 (S.D.N.Y. 1994)* (finding patent holder's inexcusable delay in seeking preliminary relief warranted the denial of its motion for preliminary injunction).

Indeed, this very Court held that a movant's six week delay in seeking preliminary relief after the commencement of an action involving trademark rights, not only neutralized any presumption of irreparable harm relating to infringement, but could justify denial of preliminary injunctive relief. *Magnet Communication, LLC. v. Magnet Communications, Inc., No. 00 Civ. 5746, 2001 WL 1097865, *1 (S.D.N.Y. Sept. 19, 2001)*. As this Court explained: Ordinarily, a likelihood of confusion establishes a presumption of irreparable harm. This presumption does not apply, however, when a Defendant has delayed without good cause in seeking emergency relief...in the instant case, I decline to manufacture a sense of urgency that is not supported by Defendants own conduct. The courts have often denied injunctions to Defendants whose delay suggested that irreparable harm was unlikely. *Krueger Int'l v. Nightingale Inc., 915 F. Supp. 595, 612-613 (S.D.N.Y. 1996)*. In *Krueger*, the Defendant claimed that it first saw the Plaintiffs allegedly infringing product at a trade show on November 2, 1997, filed suit on December 19, and requested a preliminary injunction only two days

10

later. *Id. at 600*. These principles plainly require denial of Plaintiffs' motion for a preliminary injunction.

Plaintiffs inexplicably and inexcusably delayed seeking preliminary relief against Defendants in this matter. On April 9, 2008, Plaintiffs' claim that they terminated Defendant Laing for "among other things, conduct damaging Intermed, such as the gross mismanagement of Intermed." (Memo in Support, pg. 5)

It is unclear from the Complaint, the Memo in Support or the Supporting Affidavits if Plaintiffs' whether they were aware that Defendants' Laing and/or LHC were allegedly competing with Plaintiffs' at the time they terminated him. However, they alleged that Defendants Laing and LHC were competing with Plaintiffs seven days later when they filed the Complaint on April 16, 2008. (DE# 1, Exhibit# 1) Moreover, the Complaint contains causes of action for Breach of Contract (2 counts), Breach of Fiduciary Duty, An Accounting, Conversion (2 counts), Embezzlement, Wasting Corporate Opportunity, Intentional Interference with Business Relationships and Negligence. (DE# 1, Exhibit# 1). At the end of each Cause of Action, they allege the amount of damages they are seeking with the exception of the Cause of Action for an Accounting wherein they seek equitable relief. (DE# 1, Exhibit# 1). At the end of the Complaint, has a section dedicated to "Prayer for Relief" (DE# 1, Exhibit# 1). Noticeably absent at the end of the allegations in each count or in the "Prayer for Relief" section is any mention of the necessity of seeking injunctive relief or a temporary restraining order. (DE# 1, Exhibit# 1). This is especially curious in light of the fact that Defendants alleged competing with Plaintiffs is referenced in the First, Second, Third, Seventh and Eighth causes of action. (DE# 1, Exhibit# 1).

11

Other actions on Plaintiffs' behalf also cast doubt on Plaintiffs' claim that are being irreparably harmed. Aside from the filing of the Complaint, initially filed no Motion for a Preliminary Injunction and/or a Temporary Restraining Order. Counsel for Plaintiffs and an attorney representing Defendants for purposes of attempting to resolve the matter were in ongoing discussions up and until the day before undersigned counsel filed the Notice of Removal. (See Affidavit of Chad R. Laing, Esq. attached hereto as Exhibit "B"). During the course of those discussions, counsel never received any cease and desist communications from counsel for Plaintiffs'. (Exhibit "B") In fact, counsel for Plaintiffs urged advised for the Defendants the day (May 27, 2008) before the Notice of Removal was filed to not file a response to the Complaint and that he would consent to an enlargement of time to do so. (Exhibit "B").     The day after Notice of Removal was filed, undersigned counsel was contacted by Stephen Weg, Esquire of Plaintiffs' counsel's office to advise that Plaintiffs' were seeking an Order to Show Cause.

Plaintiff has given no explanation or excuse for its delay in seeking preliminary relief or even making a claim for it in their Complaint. Indeed, there is none. It is respectfully submitted that the totality of the circumstances which include the actions taken by Plaintiffs' counsel from the time that the Complaint was filed until the Notice of Removal, it is plainly clear that Plaintiffs' "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury". *Citibank N.A., 756 F.2d at 276-77. Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc. , 335 F. Supp. 278, 280 (S.D.N.Y. 1971)* (Plaintiffs "claimed need for immediate relief is undercut by the slow pace with which Plaintiff has sought to obtain it") Based on the facts and law cited above, Defendants respectfully submit that Plaintiffs'

12

Application for a Preliminary Injunction and/or Temporary Restraining Order should be denied its' entirety.

## MONEY DAMAGES WOULD ADEQUATELY COMPENSATE PLAINTIFF

Irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction". *Helios & Matheson N. Am., Inc. v. Vegasoft Oy, 07 Civ. 3600 (PAC), 2007 WL 1541204, at *2 (S.D.N.Y. May 24, 2007)*. It is thus an abuse of discretion to award a preliminary injunction (or temporary restraining order) when the movant fails to establish irreparable harm.

To be irreparable, "the injury must be ... incapable of being fully remedied by money damages." Id. (internal quotation marks and citation omitted). Irreparable harm is "harm not readily remediable monetarily." *Monsanto Co. v. Homan McFarling, 302 F.3d 1291, 1296-97 (Fed. Cir. 2002)*; *see also EEOC v. Local 638, 71 Civ. 2877, 1995 U.S. Dist. LEXIS 7756 at *5 (S.D.N.Y. June 7, 1995)* ("Irreparable injury means 'the kind of injury for which money cannot compensate'")As stated in *Norcom Electronics Corp. v. CIM USA Inc., 104 F.Supp.2d 198 (S.D.N.Y. 2000)*: [A]lthough the loss of an ongoing business, a relatively unique product, or significant good will may give rise to irreparable harm, the loss of only part of a business will not support injunctive relief if the loss is entirely compensable in monetary damages. *Id. at 209*. Plaintiff cannot establish irreparable harm here simply by mere conjecture. Plaintiffs would need to prove, by clear and convincing evidence, that its business would be destroyed. That is a laughable proposition. *See, e.g., Shepard Indus., supra at *7* (Batts, J.) ("Monetary loss may constitute irreparable harm only [when] the movant faces 'imminent financial ruin'") (citation omitted); *Lanvin Inc. v. Colonia, Inc., 739 F. Supp. 182, 193 (S.D.N.Y. 1990)* ("A movant possesses an adequate remedy at law if the conduct in issue threatens only a disruption in its business but does not threaten its destruction."); *Reiter 's Beer*

13

*Distributors, Inc. v. Christian Schmidt Brewing Co., No. CV-86-0534, 1986 WL 13950, at \*11 (E.D.N.Y. Sept. 9, 1986)* ("where a plaintiff has only demonstrated that business would be disrupted, but failed to show that the business would be so affected that it would be forced to fold ... an adequate legal remedy exists").  In the Complaint, Plaintiffs allege among other things that Defendants Laing and/or LHC, allowed receivables to be late, kept inaccurate records of inventory and the Company's finances, consistently misstated monthly and annual company sales projections, misstated his own sales projections, often purchased the wrong inventory, often purchased too much inventory, often purchased too little inventory and often purchased inventory too late.  (DE# 1, Exhibit# 1, pg. 16.)  This hardly sounds like the type of individual, which if he was "competing", would be capable of threatening Plaintiffs "destruction" or that it force Plaintiffs' "to fold".

Moreover, the availability of money damages precludes a finding of irreparable injury, thus negating Plaintiffs demand for an injunction. Plaintiffs obviously believed that that money damages were adequate as that is the only relief they sought in the Complaint with the exception of the Cause of Action for an Accounting.  This contention only changed after Defendants took an affirmative step to defend this action, so as stated in the section of Plaintiff's inexcusable delay, their credibility in seeking this relief should be looked at skeptically.  Additionally, the Supporting Affidavits do not illustrate any material changes in Plaintiffs' knowledge of Defendant's activities since the filing of the Complaint. The Affidavit of Michael Milea is filled with generalities, but mentions two specifics which are vague in and of themselves. (DE# 16) A website purported to be Defendants is referenced on page four of Mr. Milea's affidavit.  (DE# 16, pg. 4)  There is no factual allegation that substantiates Laing and/or LHC's alleged involvement with IMT or how IMT's alleged selling of fingertip pulse oximeters violates any agreement or that the selling of same would cause Plaintiffs'

14

destruction. (DE# 16). Mr. Milea's affidavit references specifics communications Laing may have had with a Korean supplier of Plaintiffs (DE# 16, par. 22, 30). However, the references are far too vague to warrant entitlement to the relief sought herein. Lastly, there is no allegation that Mr. Milea as to when he learned this information and how.

The Affidavit of Laurie Misner is littered with speculation as well. (DE# 17). In paragraph three of her affidavit, she takes the position that she know of several instances where Laing has tried to divert business away from Plaintiffs. (DE# 17, par. 3) In support, she goes on to cite two examples where she either does not know the substance of the alleged communication between Laing and another and in an instance where Laing allegedly just left a voice mail message for a couple of individuals. (DE# 17, par. 4, 6). Clearly, these are not instances that support her contention, so her credibility in this regard should be called into question. Ms. Misner's other contentions are general in nature and certainly do not show how Plaintiffs have and will continue to incur irreparable harm. As with Mr. Milea, Ms. Misner is short on specifics as when she learned of same and how.

Finally, Plaintiffs filed a Supplemental Declaration of Joel S. Schneck. (DE# 17) Mr. Schneck's Declaration essentially was submitted to illustrate email communications between Laing and others allegedly illustrating competition. (DE# 17) First and foremost, Defendants would raise the spector of the authenticity of the alleged email communications. There is no mention in Mr. Schneck's Declaration as to process of these alleged communications are what they purport to be. Additionally, there is no evidence to support connections to IMT or again how this alleged conduct caused or could cause Plaintiffs "to fold". It should be noted that these alleged communications were certainly available to Plaintiff at or about the time they filed the Complaint. For all these

15

reasons, Defendants would respectfully request that the Court deny Plaintiffs' application on this basis as well.

## PLAINTIFFS' APPLICATION SHOULD BE DENIED AS A RESULT OF THEIR OWN UNCLEAN HANDS

It is respectfully submitted that there is an issue of Plaintiffs' unclean hands that also warrants denial of a preliminary injunction. "A preliminary injunction is an equitable remedy which need not be granted where the parties lack clean hands." *Clairol, Inc. v. Gillette Company, 270 F. Supp. 371, 379 (E.D.N.Y. 1967); affirmed 389 F. 2d 264 (2d Cir. 1968).*

In addition, "[b]ecause a court sitting in equity is 'who comes into equity must come with clean hands' if relief it to be granted. 'The defendant who invokes the doctrine of unclean hands has the burden of proof." *Gidatex, S.r.L. v. Campaniello Imports, Ltd., 82 F. Supp. 2d 126, 130 (S.D.N.Y. 1999).* The Court in *Gidatex, S.r.L.* further stated: "A court may 'deny injunctive relief based on the defense of unclean hands where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party.'" *Gidatex, S.r.L. v. Campaniello Imports, Ltd., 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999). See also, American Systems Consulting, Inc. v. Devier  Slip Copy, 2007 WL 2670049 (S.D.Ohio, 2007)* where the Court held that Plaintiff's failure to pay the Defendant their salary weighs against granting the injunction.  Plaintiffs owe Laing $3,600.00 in unpaid wages. (See Affidavit of Michael Laing attached hereto as Exhibit "D").  Accordingly, their application for the extraordinary relief they seek should be denied as a result of their own unclean hands.

16

## IF AN INJUNCTION IS ENTERED, A SUBSTANTIAL BOND
## SHOULD BE REQUIRED

While Defendants do not believe the Court should need to reach the question of a bond, should that occur, Defendants request that a substantial bond be required as security. Rule 65 of the Federal Rules of Civil Procedure provides that if a restraining order or preliminary injunction issues, the applicant must give security" in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." *Fed R. Civ. P. 65(c)*. In this case, the proposed order would effectively prevent Defendants Pugliese and IMT from selling products which would not only cause a loss of revenue, but would destroy Defendants' existing customer relationships. Such loss is very difficult to gage as IMT is a young company trying to establish itself in the martketplace. (Exhibit "A"). This monthly amount is conservative, as it places no value on the potential loss of inventory or customers. Over a one year period, the potential loss equals, conservatively would be at least $75,000.00. (Exhibit "A").

## CONCLUSION

Based on the foregoing reasons, it is respectfully submitted that Defendants have Shown Cause that Orders should not be entered herein: (a) pursuant to F.R.C.P.R. 65(a) and (b) granting a temporary restraining order and preliminary injunction enjoining Michael Laing, Laing Holdings Corporation, Robert A Pugliese and Interactive Medical Technology, Corp. from purchasing, selling promoting, and/or distributing gas cylinders, valves, regulators, conserving devices, fingertip pulse oximeters and other related devices and from otherwise competing with Intermed Gas Products,

17

LLC's business; and (b) granting such other and further relief as to this Court seems just and proper

and accordingly their application for a preliminary injunction and/or a temporary restraining order

should be denied and for any other relief that the Court deems just and proper.


Dated June 12, 2008                          _s/ Jeffrey M. Glotzer_
                                             Jeffrey M. Glotzer (Attorney Bar Code # JG2620)
                                             Email: Jeff@jeffglotzerlaw.com
                                             JEFFREY M. GLOTZER, P.A.
                                             6111 Broken Sound Pkwy, NW, Suite 330
                                             Boca Raton, Florida 33487
                                             Telephone :    (561)443-1994
                                             Facsimile:     (561)431-3104
                                             *Attorney for Defendants*

18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

972 IRREVOCABLE TRUST and
INTERMED GAS PRODUCTS, LLC,

          Plaintiffs

v.

MICHAEL LAING, ROBERTA PUGLIESE,
LAING HOLDINGS CORPORATION and
INTERACTIVE MEDICAL TECHNOLGIES, CORP.
          Defendants.

Case No.: 08-CIV-4907 (RPP)
Magistrate Judge: (HP)

ECF CASE

---

AFFIDAVIT OF ROBERTA PUGLIESE IN SUPPORT OF MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR A PRELIMINARY
INJUNCTION AND TEMPORARY RESTRAINING ORDER

STATE OF FLORIDA      )
                    )
COUNTY OF PALM BEACH )

BEFORE ME the undersigned authority, personally appeared Roberta Pugliese, who after

being duly sworn, states:

    1.     My name is Roberta Pugliese, and I am currently President and the sole shareholder

for Interactive Medical Technologies, Corp. ("IMT"), a Defendant in the above captioned matter. I

am also a Defendant, individually, in the above captioned matter. I make this affidavit in support of

Defendants Memorandum of Law in Opposition to Plaintiffs' Application for a Preliminary

Injunction and Temporary Restraining Order on behalf of myself individually and on behalf of IMT.

    2.     I am personally familiar with the facts stated herein, which are true and correct and

based upon my personal knowledge.

    3.     I currently reside in Palm Beach County, Florida and IMT is a Florida Corporation

whose principal place of business is located in Palm Beach County, Florida.



EXHIBIT "A"

4.      I have lived in Florida since 1974 and IMT has been a Florida Corporation since its inception in 2007.

5.      I do not now and have not resided in the State of New York since 1974.

6.      I, nor does IMT regularly, persistently or continuously engage in, conduct, carry on or solicit business within the State of New York. I nor does IMT own, lease, use possess or control any real property in the State of New York, nor does IMT or myself maintain a mailing address or telephone number in the State of New York. I, nor does IMT have a bank account in the State of New York. I, nor does IMT maintain an office or place of business in the State of New York.

7.      I, on behalf of myself or IMT have never traveled to New York to negotiate, discuss, obtain legal advice or engage in any conduct in connection with IMT.

8.      I, on behalf of myself and IMT do not voluntarily consent to jurisdiction in the State of New York.

9.      I had no knowledge of the existence of the Operating Agreements that were attached to Plaintiffs' Complaint ("the Operating Agreements") until I was served with a copy of the Complaint on April 24, 2008. Prior to that date, I never discussed those Operating Agreements with anyone.

10.     I am not a signatory to the Operating Agreements nor were any provisions therein communicated to me at or about the time it was purported to be executed including the forum selection clause.

11.     I did not nor had any reason to consult with an attorney before the Operating Agreements are purported to have been executed.

12.     IMT is a young company having just been formed in 2007. It is very difficult to ascertain the potential damages IMT will suffer if they are not permitted to do business. My current projections are that IMT will gross $ _75,000_  for the year 2008.

ROBERTA PUGLIESE

Sworn to me this
12th day of June, 200

VALENTINA ZIVILLICA
Notary Public, State of Florida
Commission# DD765115
My comm. expires Mar. 4, 2012

Valentina Zivellica
State of Florida
County of Palm Beach.

## AMENDED AND RESTATED

## OPERATING AGREEMENT
### FOR
### INTERMED GAS PRODUCTS, LLC
### A NEW YORK LIMITED LIABILITY COMPANY

This Operating Agreement (this "Agreement"), is made as of February 23, 2006, by and between the parties listed on the signature pages hereof (collectively referred to as the "Members" or individually as a "Member"), with reference to the following facts:

A.      On December 1, 2005 Articles of Organization ("Articles") for INTERMED GAS PRODUCTS, LLC (the "Company"), a New York limited liability company, was filed with the New York Secretary of State.

B.      As of November 30, 2005 the Members adopted and approved an operating agreement for the Company under the New York Limited Liability Company Law (the "Act").

C.      The Members desire to amend and restate the operating agreement for the Company.

NOW, THEREFORE, the Members by this Agreement set forth the amended and restated operating agreement for the Company upon the terms and subject to the conditions of this Agreement.

### ARTICLE I
### ORGANIZATIONAL MATTERS

1.1     Name. The name of the Company shall be "Intermed Gas Products, LLC." The Company may conduct business under those names or any other name approved by the Members.

1.2     Term. The term of the Company commenced as of the date of the filing of the Articles and shall continue until terminated as hereinafter provided.

1.3     Office and Agent. The Company shall continuously maintain an office and registered agent in the State of New York as required by the Act. The registered office of the Company in the State of New York is located at c/o Martell, LLC, 405 Park Avenue, 15th Floor, New York, NY 10022. The registered agent for the Company for service of process at such address is Michael Milea. The principal office of the Company shall be at 405 Park Avenue, 15th Floor, New York, New York 10022, or such other location as the Members may determine.

1.4     Business of the Company. Notwithstanding the purpose of the Company which is described in the Articles, the Company shall not engage in any business other than the following without the consent of all of the Members:

A.      the purchase from suppliers and resale of gas cylinders, valves, regulators, conserving devices and other related devices; and

B.      such other activities directly related to the foregoing business as may be necessary or advisable in the reasonable opinion of the Members to further such business.

# EXHIBIT "B"

## ARTICLE II
### CAPITAL CONTRIBUTIONS

2.1     Capital Contributions. Each Member shall make an initial contribution to the capital of the Company in kind and in the amount shown opposite the Member's name on Exhibit A attached hereto. Except as provided in this Agreement, no Member may withdraw his or her capital contribution.

2.2     Capital Accounts. The Company shall establish an individual capital account ("Capital Account") for each Member. The Company shall determine and maintain each Capital Account in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). Upon a valid transfer of a Member's interest in the Company ("Membership Interest") in accordance with Article VI, such Member's Capital Account shall carry over to the new owner.

2.3     No Interest. The Company shall not pay any interest on capital contributions.

## ARTICLE III
### MEMBERS

3.1     Admission of Additional Members. Additional Members may be admitted with the approval of all Members. Additional Members will participate in the management, "Net Profits", "Net Losses" (as such terms are defined in Section 5.1), and distributions of the Company on such terms as are determined by the Members. Exhibit A shall be amended upon the admission of an additional Member to set forth such Member's name and capital contribution.

3.2     Withdrawals or Resignations. No Member may withdraw, retire or resign from the Company, other than in connection with a transaction permitted by Section 7 hereof.

3.3     Payments to Members. Except as specified in this Agreement or pursuant to a transaction permitted by Section 4.6, no Member or person or entity controlled by, controlling or under common control with the Member (each such person or entity is defined as an "Affiliate"), is entitled to remuneration for services rendered or goods provided to the Company. However, the Company shall reimburse the Members and their Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company, prepare the Articles and this Agreement and, as approved by the Members, for the actual cost of goods and materials used by the Company.

## ARTICLE IV
### MANAGEMENT AND CONTROL OF THE COMPANY

4.1     Management and Powers. Except as otherwise expressly provided herein, each Member shall participate in the control, management and direction of the business of the Company, and, except as otherwise expressly provided herein, all decisions or consents of Members shall be taken by majority vote, with each Member entitled to vote in accordance with its Membership Interest. By majority consent, the Members may appoint, employ, fire, or otherwise contract with any persons or entities for the transaction of business of the Company or the performance of services for or on behalf of the Company, and the Members may delegate to any such person or entity such authority to act on behalf of the Company as the Members may from time to time deem appropriate. Notwithstanding the generality of the foregoing, a majority must include the vote of Martell's Membership Interest. In the event that a vote of a majority of Membership Interests does not include the affirmative vote of Martell, it shall be deemed not to have been affirmatively voted on.

4.2     Special Bankruptcy Rule. The Company may not file for protection from its creditors under the United States Bankruptcy Code or any other federal or state statute affecting the rights of creditors generally, without the written approval of a majority in interest of the Membership Interests, and if Martell, LLC ("Martell"), for whatever reason, does

2

not hold a majority in interest of the Membership Interests then, such filing may not be made without the express written approval of Martell.

     4.3    <u>Member Approval</u>. No annual or regular meetings of the Members are required to be held. However, if such meetings are held, such meetings shall be noticed, held and conducted pursuant to the Act. In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Act. Unless otherwise expressly provided in this Agreement, approval of the Members shall mean the majority approval of the Membership Interests

     4.4    <u>Devotion of Time</u>. [M LCO] ("MLCO") and its principal Michael Laing ("Laing") and [WMCO] ("WMCO") and its principal William Murray ("Murray") shall devote their full time and attention to the business of the Company and Martell shall devote whatever time or effort it deems appropriate for the furtherance of the Company's business.

     4.5    <u>Competing Activities</u>. The Members and their Affiliates may engage or invest in any activity. The Members of the Company may not engage in any transaction competitive with the business of the Company. Expand.

     4.6    <u>Member's Responsibilities</u>. Notwithstanding the generality of this Article IV, Martell shall have the responsibility of originating, negotiating the terms and conditions of and managing each of the financing transactions entered into by the Company. Martell shall, in its sole discretion, provide adequate financing to fund the purchase of inventory by the Company. Martell shall also give business advice to the Company, including but not limited to, inventory planning, negotiating terms with suppliers, including timing, pricing, quality control, shipping schedules, delivery schedules, Letter of Credit terms, etc., negotiate payment terms with key customers, review new hirings, meet with salesmen, attend staff meetings, review contracts, review receivables, source and engage consultants to implement software upgrades, engage accountants, bookkeepers etc., who shall report to Martell. Martell shall also provide financial and consulting services to the Company. All of the foregoing shall be governed by a separate Finance and Service Agreement between Martell, or an affiliate, and the Company. The failure by Martell to engage in any of the specified services shall not constitute a default be Martell under this Agreement or give rise to any defense to the Obligations of the Company pursuant to the Finance and Service Agreement. MLCO and WMCO shall have the responsibility of arranging for the purchase and sale of inventory.

     4.7    <u>Transactions between the Company and the Members</u>. Notwithstanding that it may constitute a conflict of interest, the Members and their Affiliates may engage in any transaction with the Company so long as such transaction is not expressly prohibited by this Agreement and if the transaction is approved in writing by unanimous consent of the Membership Interests.

**ARTICLE V**

**ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS**

     5.1    <u>Definitions</u>. When used in this Agreement, the following terms shall have the meanings set forth below.

     "<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Treasury Regulations.

     "<u>Company Minimum Gain</u>" shall have the meaning ascribed to the term "Partnership Minimum Gain" in the Treasury Regulations Section 1.704-2(d).

     "<u>Member Nonrecourse Debt</u>" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Treasury Regulations Section 1.704-2(b)(4).

3

"Member Nonrecourse Deductions" shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

"Membership Interest" shall mean the Membership Interest of a Member set forth on Exhibit "A" hereto.

"Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting at the close of each fiscal year employed on the Company's information tax return filed for federal income tax purposes.

"Nonrecourse Liability" shall have the meaning set forth in Treasury Regulations Section 1.752-1(a)(2).

"Treasury Regulations" shall mean the final or temporary regulations that have been issued by the Department of Treasury pursuant to its authority under the Code, and any successor regulations.

5.2    Allocations of Net Profit and Net Loss.

A.    Net Loss.  Net Loss shall be allocated to the Members in proportion to their Membership Interest.  Notwithstanding the previous sentence, loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such Member's share of Company Minimum Gain that would be realized on a foreclosure of the Company's property. Any loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of losses under this Section 5.2A).  Any loss reallocated under this Section 5.2A shall be taken into account in computing subsequent allocations of income and losses pursuant to this Article V, so that the net amount of any item so allocated and the income and losses allocated to each Member pursuant to this Article V, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to this Article V if no reallocation of losses had occurred under this Section 5.2A.

B.    Net Profit.  Net Profit shall be allocated to the Members in proportion to their Membership Interests.

5.3    Special Allocations.  Notwithstanding Section 5.2,

A.    Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 5.3A shall be made in proportion to the amounts required to be allocated to each Member under this Section 5.3A.  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f).  This Section 5.3A is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

B.    Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt.  If there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any fiscal year, each member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(5)).  Allocations pursuant to this Section 5.3B shall be made in proportion to the amounts required to be allocated to each Member under this Section

4

5.3B.  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(b)(2). This Section 5.3B is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2(f)(4) and shall be interpreted consistently therewith.

C.  Nonrecourse Deductions.  Any nonrecourse deductions (as defined in Treasury Regulations Section 1.704-2(b)(1)) for any fiscal year or other period shall be specially allocated to the Members in proportion to their Membership Interests.

D.  Member Nonrecourse Deductions.  Those items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Treasury Regulations Section 1.704-2(i).

E.  Qualified Income Offset.  If a Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible.  Any special allocations of items of income and gain pursuant to this Section 5.3E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article V so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Section 5.3E to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Article V if such unexpected adjustments, allocations, or distributions had not occurred.

5.4  Code Section 704(c) Allocations.  Notwithstanding any other provision in this Article V, in accordance with Code Section 704(c) and the Treasury Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution.  Allocations pursuant to this Section 5.4 are solely for purposes of federal, state and local taxes.  As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

5.5  Distribution of Assets by the Company.  Subject to applicable law and any limitations contained elsewhere in this Agreement, Members, acting by unanimous consent, may elect from time to time to cause the Company to make distributions.  Distributions shall be first to the Members in proportion to their unreturned capital contributions until each Member has recovered his or her capital contributions, and then to the Members in proportion to their Membership Interests.

**ARTICLE VI**
**TRANSFER AND ASSIGNMENT OF INTERESTS**

6.1  Transfer and Assignment of Interests.  No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Membership Interest (collectively, "transfer") except with the prior approval of a majority in interest of all Membership Interests, which approval may be given or withheld in the sole discretion of the Members.  Notwithstanding the generality of the foregoing, Martell may transfer its ownership to another entity, with substantially similar ownership, provided that such transfer shall not have a Material Adverse Effect on the business as such term is defined in the Finance and Service Agreement between the parties dated October  , 2005.  Additionally, notwithstanding the generality of the foregoing, a majority must include the vote of Martell's Membership Interest.  In the event that a vote of a majority of Membership Interests does not include the affirmative vote of Martell, it shall be deemed not to have been affirmatively voted on.

5

6.2    <u>Substitution of Members.</u>  A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) consent of the Members is given in accordance with Section 6.1, (ii) such person executes an instrument satisfactory to the Members accepting and adopting the terms and provisions of this Agreement, and (iii) such person pays any reasonable expenses in connection with his or her admission as a new Member.  The admission of a substitute Member shall not release the Member who assigned the Membership Interest from any liability that such Member may have to the Company.  Notwithstanding the generality of the foregoing, Martell may transfer its interest, without the consent of any other Member, to its source of funding.

6.3    <u>Transfers in Violation of this Agreement and Transfers of Partial Membership Interests.</u>  Upon a transfer in violation of Article VI or Article VII, the transferee shall have no right to vote or participate in the management of the Company or to exercise any rights of a Member.  Such transferee shall only be entitled to receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor would otherwise be entitled.  Notwithstanding the immediately preceding sentences, if, in the determination of the remaining Members, a transfer in violation of this Article VI would cause the termination of the Company under the Code, in the sole discretion of the remaining Members, the transfer shall be null and void.

**ARTICLE VII**
**SPECIAL PROVISIONS**

7.1    <u>Distributions.</u>    Notwithstanding any other provisions in this Agreement, the Company shall make distributions of cash flow as follows:

A.    <u>While Note from Laing and Murray is Outstanding.</u>    While there is an outstanding note from Laing and Murray (collectively the "Stockholders"), to Intermed Gas Products, Incorporated ("IGI") then, on a bimonthly basis, the Company shall distribute one hundred percent (100%) of its cash flow to its Members in accordance with their Membership Interests, MLCO and WMCO each agrees to in turn distribute one hundred percent (100%) of said cash flow to the Stockholders, who in turn agree to use 100% of said cash flow to repay their note to IGI and cause IGI to use one hundred percent (100%) of such cash flow to pay outstanding third party payables of IGI, until such obligations are paid in full.

B.    <u>After Note from Laing and Murray is Paid.</u>    After the note from the MB Stockholders to IGI is paid in full, then the Company, on a bimonthly basis, shall distribute an amount sufficiently adequate so that the member may pay their federal, state and local income taxes on K-1 income from the Company.

7.2    <u>Martell's Option to Purchase.</u>

A.    <u>First Option.</u>    Martell shall have an option to purchase fifty percent (50%) of each of MLCO's and WMCO's Membership Interest in the Company on February 28, 2007, each at a purchase price equal to three and one half (3½) times the cashflow of the Company for the Fiscal Year ended November 30, 2006 multiplied by .25 (representing approximately 25% of the Membership Interests of the Company). Payment shall be made in cash at the time of closing.

B.    <u>Second Option.</u>    Martell shall have an option to purchase fifty percent (50%) of each of MLCO's and WMCO's Membership Interest in the Company on February 28, 2008, each at a purchase price equal to three and one half (3½) times the cashflow of the Company for the Fiscal Year ended November 30, 2007 multiplied by .25 (representing approximately 25% of the Membership Interests of the Company) . Payment shall be made in cash at the time of closing.

C.    <u>Third Option.</u>    At any time prior to November 30, 2006 Martell shall have the option to purchase twenty-five percent (25%) of each of MLCO's and WMCO's Membership Interests in exchange for agreeing to modify the First and Second Options described above as follows:

1.    The First Option shall be modified so that the relevant fiscal year ending is January 31, 2007, the Closing Date is April 30, 2007 and the calculation shall be three and one half (3 1/2) times the cashflow of the Company multiplied by .1875 (representing approximately 18.75% of the Membership Interests of the Company).

2.    The Second Option shall be modified so that the relevant fiscal year ending is January 31, 2008, the Closing Date is April 30, 2008 and the calculation shall be three and one half (3 1/2) times the cashflow of the Company multiplied by .1875 (representing approximately 18.75% of the Membership Interests of the Company).

7.3    <u>Security Agreement.</u>    MLCO and WMCO shall enter into a security or pledge agreement with Martell pledging their Membership Interests in the Company to Martell as additional security for the Advances made by Martell pursuant to the Finance and Service Agreement.

7

# ARTICLE VIII
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

8.1    Books and Records. The books and records of the Company shall be kept in accordance with the accounting methods followed for federal income tax purposes. The Company shall maintain at the principal office of the Company all of the following:

A.    A current list of the full name and last known business or residence address of each Member set forth in alphabetical order, together with the capital contributions, capital account and Membership Interest of each Member;

B.    A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

C.    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

D.    A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

E.    Copies of the financial statements of the Company, if any, for up to the six (6) most recent fiscal years; and

F.    The Company's books and records as they relate to the internal affairs of the Company, if any, for up to at least the current and past four (4) fiscal years.

8.2    Reports. The Company shall cause to be filed, in accordance with the Act, all reports and documents required to be filed with any governmental agency. The Company shall cause to be prepared at least annually information concerning the Company's operations necessary for the completion of the Members' federal and state income tax returns. The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each taxable year (i) such information as is necessary to complete the Members' federal and state income tax or information returns and (ii) a copy of the Company's federal, state, and local income tax or information returns for the year.

8.3    Bank Accounts. The Members shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other person

8.4    Tax Matters for the Company. Martell is designated as "Tax Matters Partner" (as defined in Code Section 6231), to represent the Company (at the Company's expense) in connection with all examination of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith.

8.5    Reports to Members. The Company shall give financial reports to each member, monthly 30 days after the end of each month and annually, 75 days after the end of each year. Martell shall designate the preparer of such financial statements.

8.6    Accountant. The certified public accountants for the Company shall be Rachlin & Cohen or such other certified public accountants as chosen by Martell.

8

# ARTICLE IX
## DISSOLUTION AND WINDING UP

9.1    Conditions of Dissolution.  The Company shall dissolve upon the occurrence of any of the following events:

    A.    Upon the entry of a decree of judicial dissolution pursuant to the Act;

    B.    Upon the unanimous consent of the Membership Interests; or

    C.    The sale of all or substantially all of the assets of Company.

9.2    Winding Up.  Upon the dissolution of the Company, the Company's assets shall be disposed of and affairs wound up.  The Company shall give written notice of the commencement of the dissolution to all of its known creditors.

9.3    Order of Payment of Liabilities Upon Dissolution.  After determining that all the known debts and liabilities of the Company have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with their positive capital account balances, after taking into account income and loss allocations for the Company's taxable year during which liquidation occurs.

9.4    Limitations on Payments Made in Dissolution.  Except as otherwise specifically provided in this Agreement, each Member shall be entitled to look only to the assets of the Company for the return of his or her positive Capital Account balance and shall have no recourse for his or her Capital Contribution and/or share of Net Profits against any other Member except as provided in Article X.

9.5    Certificates.  The Company shall file with the New York Secretary of State, a Certificate of Dissolution upon the dissolution of the Company and a Certificate of Cancellation upon the completion of the winding up of the Company's affairs.

# ARTICLE X
## INDEMNIFICATION

10.1    Indemnification of Agents.  The Company shall indemnify any Member and may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, officer, employee or other agent of the Company or that, being or having been such a Member, officer, employee or agent, he or she is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit.

# ARTICLE XI
## INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Members and the Company as follows:

11.1    Preexisting Relationship or Experience.  He or she has a preexisting personal or business relationship with the Company or one or more of its officers or controlling persons, or by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he or she

9

is capable of evaluating the risks and merits of an investment in the Company and of protecting his or her own inter. connection with this investment.

11.2    No Advertising. He or she has not seen, received, been presented with, or been solicited by leaflet, public promotional meeting, article or any other form of advertising or general solicited with respect to the sa the Membership Interest.

11.3    Investment Intent. He or she is acquiring the Membership Interest for investment purposes for his her own account only and not with a view to or for sale in connection with any distribution of all or any part of Membership Interest. No other person will have any direct or indirect beneficial interest in or right to the Members Interest.

11.4    Legal Representation. He or she has had the opportunity to consult with legal counsel before assent to the terms of this Agreement.

## ARTICLE XII
## MISCELLANEOUS

12.1    Complete Agreement. This Agreement and the Articles constitute the complete and entire statement of agreement among the Members with respect to the subject matter herein and therein and replace supersede all prior written and oral agreements among the Members. To the extent that any provision of the Article conflict with any provision of this Agreement, the Articles shall control.

12.2    Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

12.3    Interpretation. All pronouns shall be deemed to refer to the masculine, feminine, or neuter, singular and plural, as the context in which they are used may require. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the interpretation of any provision of this Agreement. Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his or her counsel.

12.4

Jurisdiction. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND RULE 327(b) OF THE NEW YORK CIVIL PRACTICE LAW AND RULES. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED IN THE CITY, COUNTY AND STATE OF NEW YORK IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING RELATED TO THIS AGREEMENT OR ANY OF THE MATTERS CONTEMPLATED HEREBY, IRREVOCABLY WAIVES ANY DEFENSE OF LACK OF PERSONAL JURISDICTION AND IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH COURT. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT THEY MAY EFFECTIVELY DO SO UNDER APPLICABLE LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

12.5    Service. Each Member further agrees that personal jurisdiction over him or her may be effected service of process by registered or certified mail addressed as provided in Section 12.7 of this Agreement that when so made shall be as if served upon him or her personally within the State of New York.

12.6    Severability. If any provision of this Agreement or the application of such provision to any persons or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

12.7    Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been and received when delivered to the address specified by the party to receive the notice. Such notices given to a Member at the address specified in Exhibit A hereto. Any party may, at any time by giving five days' prior written notice to the other Members, designate any other address in substitution of the foregoing address to which such notice will be given.

12.8    Amendments. All amendments to this Agreement will be in writing and signed by all of the Members.

12.9    Multiple Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. Facsimile signature shall be valid to enforce this Agreement.

12.10    Attorney Fees. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party including without limitation, reasonable attorneys' fees and expenses; all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate allowed by law. For the purposes of this Section: (a) attorney fees shall include, without limitation, fees incurred in the following: (1) postjudgment motions; (2) contempt proceedings; (3) garnishment, levy, and debtor and third party examinations; (4) discovery; and (5) bankruptcy litigation and (b) prevailing party shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

12.11    Remedies Cumulative. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.


<u>THE BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK</u>

11

IN WITNESS WHEREOF, all of the Members of Intermed Gas Products, LLC, A New York Limited
Company, have executed this Agreement, effective as of the date written above.

Martell, LLC

By: Michael Milea, Managing Member

[MLCO]

By: Michael Laing, President

[WMCO]

By: William Murray, President

CONSENTED TO AS TO SECTION 4.4:

Michael Laing, individually

William Murray, individually

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

972 IRREVOCABLE TRUST and
INTERMED GAS PRODUCTS, LLC,                    Case No.:  08-CIV-4907 RPP-HP
                                                ECF CASE

          Plaintiffs

v.

MICHAEL LAING, ROBERTA PUGLIESE,
LAING HOLDINGS CORPORATION and
INTERACTIVE MEDICAL TECHNOLGIES, CORP.
          Defendants.

_____

AFFIDAVIT OF CHAD LAING

STATE OF FLORIDA          )
                          )
COUNTY OF PALM BEACH  )

          BEFORE ME, the undersigned authority, personally appeared Chad Laing, who after being

duly sworn, states:

          1.          My name is Chad Laing and I am an attorney in Boca Raton, Florida.

          2.          I am a partner in the law firm of Laing & Landolfi, LLC.

          2.          I make this affidavit based on personal knowledge.

          4.          In mid to late April 2008 I undertook the representation of Defendants at or about the

time the Complaint was filed and/or served for the express purpose of attempting to settle the case

before a responsive pleading was due to be filed on behalf of the Defendants.

          5.          I either spoke to or communicated via email with counsel for Plaintiffs', Robert L.

Rimberg on a fairly regular basis from late April up and until May 27, 2008, the day before

Defendants filed their Notice of Removal to this Court.

          6.          At no time during our conversations or communications did Mr. Rimberg issue a



EXHIBIT "C"

"cease and desist" directive as it related to any of the activities of the Defendants.

7.    The day before the Notice of Removal was filed, I had a conversation with Mr. Rimberg wherein he advised me that discussions to resolve the case should continue, that Defendants should not file a Response to the Complaint and that he would agree to any extensions of time we sought related to same.

_____

CHAD LAING

Sworn to me this
12TH day of June, 2008


_____
Notary Public

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

972 IRREVOCABLE TRUST and
INTERMED GAS PRODUCTS, LLC,

        Plaintiffs

v.

MICHAEL LAING, ROBERTA PUGLIESE,
LAING HOLDINGS CORPORATION and
INTERACTIVE MEDICAL TECHNOLGIES, CORP.
        Defendants.
_____

Case No.: 08–CIV-4907 (RPP)
Magistrate Judge: (HP)

ECF CASE

## AFFIDAVIT OF MICHAEL LAING

STATE OF FLORIDA    )
                )
COUNTY OF PALM BEACH )

BEFORE ME the undersigned authority, personally appeared Roberta Pugliese, who after being duly sworn, states:

1.     My name is Michael Laing, and I am currently President and the sole shareholder for Laing Holdings Corporation ("LHC"), a Defendant in the above captioned matter. I am also a Defendant, individually, in the above captioned matter. LHC is a managing member of Plaintiff, Intermed Gas Products, LLC.

2.     I make this affidavit based on personal knowledge.

3.     Prior to getting served with a copy of the Complaint in this case on April 28, 2008, I had never discussed any Operating Agreement I may have entered into with respect to Intermed Gas Products, LLC with Defendant Roberta Pugliese nor I had ever shown her a copy of same.

4.     Intermed Gas Products, LLC owes me $3,600.00 in unpaid wages.

X _____
Michael Laing

VALENTINA ZIVILLICA
Notary Public, State of Florida
Commission# DD765115
My comm. expires Mar. 4, 2012

State of FL, Palm Beach.

EXHIBIT D

MICHAEL LAING

Sworn to me this
12th day of June, 2008

Notary Public   Valentina Zivillica

VALENTINA ZIVILLICA
Notary Public, State of Florida
Commission# DD765115
My comm. expires Mar. 4, 2012

State of Florida
County of Palm Beach.